ARTHUR M. SLAVIN, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 94768.  Promulgated March 25, 1941.

*John S. Cannon, Esq.*, for the petitioner.
*Angus R. Shannon, Jr., Esq.*, for the respondent.

1102

OPINION.

ARNOLD: The petitioner's only source of income was gambling. While he received some money as salary for operating gambling games for Baughman and others and a substantial amount of cash passed through his hands in operating the casino, the issues relating to the correctness of the deficiencies are confined to two items, namely, the income charged to him as a result of the dealings in cashier's checks, and the income charged to him as unexplained bank deposits. The latter item involved deposits by petitioner in his own name with the Baltimore Bank and the Home Trust Co. The Commissioner treated $10,474.71 of the 1929 deposits and $13,018.00 of the 1930 deposits as income. The petitioner asks us to find that these deposits represented transactions by him as agent for the Cuban Gardens, or for McNamee. However, he testified that the accounts were his own, that he deposited therein money which he won by gambling, and that he made withdrawals for his personal use. The ledger sheets of the banks show all deposits and withdrawals, but the petitioner was unable more definitely to identify any item except to state that on some occasions he had drawn checks in payment of items purchased for the Cuban Gardens, and that, when he did so, he replaced the money by depositing a cashier's check from the bank roll. He recalled that he had purchased a roulette wheel for $1,000. McNamee testified that the petitioner paid $1,900 for a heating plant in 1929, and was reimbursed. The deposit slips disclose that the petitioner deposited $3,000

in 1929 and $5,000 in 1930 in the form of cashier's checks, and the remaining deposits consisted of cash and personal checks. The ledger sheets disclose a deposit of $1,995 on October 17, 1929, and withdrawal of the same amount on October 18, 1929. The Commissioner treated this item as an unidentified deposit, but the evidence clearly shows it was not income of the petitioner. The Commissioner made allowance for the identified deposits of $3,000 in 1929 and $5,867 in 1930—more than the amount of cashier's checks deposited. The evidence further shows that, when the petitioner left Kansas City in 1931, he withdrew the balances in these accounts, and there is no evidence that he accounted for any of the money to McNamee or any one else. We hold that $8,479.71 of the deposits of 1929, and $13,018 of the deposits of 1930 were profits from gambling, and constituted income of the petitioner in those years. *Robert Burd*, 19 B. T. A. 734; *Pincus Brecher*, 27 B. T. A. 1108; *Russell C. Mauch*, 35 B. T. A. 617; *Leonard B. Willits*, 36 B. T. A. 294.

The Commissioner reduced the total amount of cashier's checks purchased by amounts which he considered as having been used to acquire other cashier's checks or to pay gambling losses and expenses, and treated the remainder, together with minor amounts of cash received in the exchange of checks, as profits from gambling. The amount included in income as profits was $58,611.13 for 1929 and $107,917.24 for 1930. Several hundred checks were introduced in evidence. Many of them, in an amount exceeding the amount which the Commissioner included in income, contained the endorsement only of the petitioner, and, in some instances, the endorsement of a bank other than the issuing bank at which the check was cashed. The Commissioner relies on this evidence, and the testimony of a revenue agent who made an audit of the checks and bank records, to support his determination. The petitioner makes no attempt to demonstrate error in the Commissioner's computation of the profits, but contends that no part of the money represented by the checks is taxable to him as income, because he was a mere money handler or agent for Lazia and McNamee, who contributed the capital and were the sole owners and operators of the Cuban Gardens.

The record shows conclusively that the petitioner was not the sole owner and operator of this enterprise, but that he was jointly interested with others, and was entitled to a portion of the profits. The petitioner was to share in the profits to the extent of 15 percent in 1929 and 25 percent in 1930. While McNamee testified that the petitioner was to participate in profits only after McNamee and Lazia had recovered their advances, the petitioner in his testimony placed no such limitation upon the agreement. McNamee and the petitioner

testified that the Cuban Gardens was not operated for a sufficient length of time to enable them to realize any profit, and that the petitioner did not in fact retain any of the funds entrusted to him or receive any payment as his share of the profits. They kept no written records of their daily receipts and expenses, and have not informed us of the amount thereof or the amounts advanced by McNamee in excess of $6,000.

It was the duty of petitioner to produce facts upon which we might make our own determination whether there were any profits. *W. M. Buchanan*, 20 B. T. A. 210; *Leonard B. Willits*, *supra*. The documentary evidence shows not only that the operation of the Cuban Gardens was profitable, but also that a substantial part of the funds represented by the cashier's checks was in fact received and used by the petitioner. It also appears that the petitioner had a wide experience in handling enterprises of this character and that other gamblers paid him well for such services. His services and experience were an important and necessary factor in the operation of the business, and it is unreasonable to suppose that he would give his entire time to it for over a year without sharing in the profits which passed through his hands from day to day. His testimony, together with the documentary evidence and the surrounding facts and circumstances, warrants the conclusion that he shared in all profits from the inception of the enterprise. Since his share was fixed at 15 percent in 1929 and 25 percent in 1930, it is obvious that the Commissioner erred in so far as he included any greater proportion of the profits in the petitioner's income.

The evidence indicates that not all of the amounts represented by the cashier's checks were funds of the Cuban Gardens. Some items may be segregated as individual profits of the petitioner, and, by charging the petitioner with 15 and 25 percent of the remainder of the profits as computed by the Commissioner, his income from the Cuban Gardens may be approximated as closely as is possible on this record. *Cohan* v. *Commissioner*, 39 Fed. (2d) 540; *Robert McCarthy Bullington*, 38 B. T. A. 754.

The severable items are as follows:

During 1929, and before the opening of the Cuban Gardens and the setting up of the initial bank roll of $6,000, the petitioner purchased and cashed $3,879.55 of cashier's checks. These clearly were not funds of the Cuban Gardens. They were acquired in July and August 1929, while the petitioner was operating for Baughman and Lazia. Baughman was paying him $10 per day and 10 percent of the profits. The record is silent as to such profits and as to any income received from Lazia. These checks with many others purchased after

September 12 were exhibited to the petitioner, who said they constituted funds of the Cuban Gardens. Under the circumstances, and in view of the petitioner's inability at any time to state facts concerning any particular check, we think the checks purchased prior to September 1929 constituted profits of the petitioner from gambling other than that conducted for Cuban Gardens, and that the Commissioner properly included them in income for 1929.

The petitioner asks us in his brief to find that a cashier's check for $2,000, issued by the National Bank of North Kansas City on May 7, 1930, represented money loaned to him by one Donegan, who operated the restaurant, and that he repaid Donegan in 1931 when the check was cashed. His testimony is that he borrowed the money which went into this check from Baughman, for use in the petitioner's individual gambling operations, but that he never used it, and the check remained in his possession until April 15, 1931, when he cashed it and repaid Baughman. The records of the issuing bank show that the petitioner purchased the check with a check drawn on his personal bank account. The checking account at the Home Trust Co. discloses a withdrawal of $1,000 on May 7, 1930, while that at the Baltimore Bank discloses a balance on hand at that date of only $234.84. The inference is that the petitioner had a checking account at the National Bank of North Kansas City and the check was paid from that source. The petitioner made no attempt, upon being recalled, to explain the conflict between his testimony and the bank records. We are of the opinion that the money used to purchase this check represented profits of the petitioner from gambling other than that conducted for Cuban Gardens, and that the Commissioner properly included the amount thereof in income for 1930.

The Commissioner included in the petitioner's income 12 cashier's checks issued in 1929, totaling $4,000, which were endorsed in the name of the petitioner and the Gregg Tire Co., and cashed at a Topeka bank by George R. Gregg. The evidence shows that Gregg gambled at the Cuban Gardens and won and lost money. Gregg is deceased, and the Commissioner sought to prove by his widow that Gregg borrowed this money from the petitioner. Mrs. Gregg denied any knowledge of such a transaction. Some of the checks were endorsed not by the petitioner but by McNamee. We are of the opinion that these checks came to the hands of Gregg as winnings from gambling. They should therefore be treated as gambling losses in computing petitioner's share of the profits from the Cuban Gardens.

The exclusion of the above items of $3,879.55 and $4,000 in 1929 and the item of $2,000 in 1930 from the profit from dealings in cashier's checks, as computed by the Commissioner, leaves $50,731.58 in 1929

and $105,917.24 in 1930 as the total profits realized by the Cuban Gardens and we hold that 15 percent of the former and 25 percent of the latter amount constitutes taxable income of the petitioner.

The determination of the Commissioner that a profit was realized from the operation of the Cuban Gardens is supported by the huge amount of cashier's checks handled over a period of approximately one year and by the endorsements indicating that a substantial portion of them were cashed by no one other than the petitioner. It also appears that on some days the profits were as high as $8,000, and that during the first three and a half months they were sufficient to reimburse Lazia and McNamee to the extent of more than $18,500. The documentary evidence shows that the petitioner from time to time made deposits in his personal checking accounts varying from $500 to $1,500; that soon after the Cuban Gardens had closed and his arrangement with McNamee had been terminated, he received the proceeds of $6,000 of the cashier's checks purchased in 1930 and, in addition, that he purchased over $30,000 of cashier's checks; and that in 1931 he deposited $6,577 in his personal accounts. The record further shows that he loaned $2,500 to another gambler and that he took funds to New Orleans and invested an undisclosed amount in some business. During all of this period he supported his family. In the light of these facts and the absence of proof of the actual receipts and disbursements, we are unable to give any credence to the testimony of the petitioner and McNamee that there were no profits and that the petitioner received none of the proceeds of the cashier's checks which passed through his hands or none of the profits from the operation of the Cuban Gardens.

We conclude that the petitioner received income in the taxable years from gambling activities in the following amounts:

|  | 1929 | 1930 |
|---|---|---|
| Personal bank deposits | $8,479.71 | $13,018.00 |
| Personal dealings in cashier's checks | 3,879.55 | 2,000.00 |
| Percentage of profits from Cuban Gardens | 7,609.74 | 26,479.31 |
| Total | 19,969.00 | 41,497.31 |

The next issue is whether any part of the deficiencies is due to fraud with intent to evade tax. Sec. 293 (b), Revenue Act of 1928. The statute imposes the burden of proof on the Commissioner. The evidence adduced shows that taxable income in substantial amounts was realized during both years. The nature of this evidence is indicated in our previous discussion and in our findings of fact. We have carefully weighed and considered the evidence and have given petitioner the benefit of the doubt as to certain disputed items. But

viewing petitioner's whole course of conduct, his various acts and transactions, together with the inferences to be drawn therefrom, it is our opinion that his failure to file any return of income for 1929 evidences a fraudulent intent, *M. Rea Gano*, 19 B. T. A. 518, 533, and that the understatement of his income for 1930 was due to fraud with intent to evade tax. *Charles E. Mitchell*, 32 B. T. A. 1093; affd., 303 U. S. 391. Respondent's determination of fraud for both years is therefore approved.

Since petitioner had taxable income for 1929 of not less than $19,969, and since he did not file a return for that year, the imposition of the 25 percent penalty under section 291 is mandatory, *Douglas L. Edmonds, Administrator*, 31 B. T. A. 962; affd., 90 Fed. (2d) 14; certiorari denied, 302 U. S. 713; *Kathryn Lammerding*, 40 B. T. A. 589; and constitutes a separate liability from the fraud penalty under section 293 (b). *Pincus Brecher, supra.*

*Decision will be entered under Rule 50.*