James T. Bennett v. Commissioner.
Bennett v. Commissioner
Docket No. 17395.
United States Tax Court
1950 Tax Ct. Memo LEXIS 286; 9 T.C.M. (CCH) 72; T.C.M. (RIA) 50027; January 31, 1950
*286 Petitioner filed delinquent income tax returns for the years 1942 to 1946, inclusive, in which he reconstructed and reported his taxable income upon the basis of an analysis of his bank account, no other records or accounts having been maintained at any time. Respondent reconstructed petitioner's taxable income upon the basis of annual increases in his net worth and determined the deficiencies, interest, and additions to tax for such taxable years thereon. Held, respondent correctly determined petitioner's tax liability upon the annual increase in net worth method; held further, that respondent correctly determined that there was fraud with intent to evade tax with respect to each of the taxable years 1933 to 1946, inclusive. James H. Cleveland, Esq., Union Trust Bldg., Cincinnati, O., and Gregory J. Holbrock, Esq., for the petitioner. W. W. Kerr, Esq., for the respondent. ARNOLD Memorandum Findings of Fact and Opinion This proceeding involves income tax deficiencies, 25 per cent additions to the tax for failure to file returns under section 291 of the Internal Revenue Code, and 50 per cent addition to the tax for fraud under section 293 of the applicable Revenue Acts and the Internal *287 Revenue Code for the years and in the amounts as follows: 25%
50%
Year
Deficiency
Addition
Addition
1933
$ 137.95
1934
20.66
1935
61.76
1936
133.96
1937
268.74
1938
648.33
1939
184.52
1940
115.31
1941
468.36
1942
$ 7,828.20
$1,311.73
3,914.10
1943
2,593.35
648.34
2,686.40
1944
24,964.33
6,241.08
13,084.54
1945
8,666.25
2,166.56
4,425.87
1946
1,324.51
331.12
705.81 The issues are (1) whether the deficiencies for the years 1942 to 1946, inclusive, were properly determined upon the basis of increases in petitioner's net worth; and (2) whether there was fraud with intent to evade tax for each of the taxable years. Petitioner admits liability for the 25 per cent addition to the tax for delinquency, under section 291 of the various Revenue Acts and the Code, but contends he has paid all amounts due under said section. Findings of Fact The petitioner is a resident of Cincinnati, Ohio, where he has resided since 1920. At the time of the hearing herein he was 78 years of age. His sole occupation for the past 60 years has been gambling. Petitioner turned to gambling as a means of livelihood when he was 18. He worked first as a "booster," i.e., he worked for the gambling houses to keep their games going. Later he began to gamble on his *288 own account. When he moved to Cincinnati in 1920 he testified that he had accumulated about $18,000. In or about 1921 petitioner joined the Cuvier Press Club. He played poker at this Club until the effects of the depression broke up the poker games. Bennett then obtained permission from the Club authorities to take some bets on horse races. At first he phoned his bets in to another bookmaker with whom he operated on a 50-50 basis as to profits and losses. But in 1935 or 1936 he began to accept bets on his own account. Prior to 1942 another bookmaker's agent also operated at the Club, but thereafter Bennett was the sole operator there. In January 1945 gasoline rationing banned horse racing on all tracks in the United States. When the American tracks were closed petitioner accepted some bets on Mexican horse races but this did not work out due to slowness in getting the race results. Petitioner testified that he has had no connection with race horse book operation or poker playing since 1945. At no time during his gambling operations did petitioner maintain a record of his earnings or losses. Until about 1933 he carried his money on his person in a money belt, paying off his obligations *289 in cash. In or about 1933 he opened checking accounts in two Cincinnati banks through which he cleared checks. He also acquired a safe deposit box in which he kept substantial sums of cash and other property. In 1942 petitioner began purchasing government bonds Series "G" and "E". His purchases were made principally with cash. His checking accounts showed approximately $10,000 of bonds purchased by check. The series, dates and amounts of government bonds purchased by petitioner were as follows: Series "G" Bonds
Year
Date
Amount
Total
1942
April
$10,000
May
1,000
August
1,000
September
1,000
October
2,000
December
3,000
$18,000
1943
April
$ 1,000
August
1,000
September
2,000
November
3,000
December
6,000
$13,000
1944
January
$ 4,000
March 21
9,000
May 13
10,000
June 15
1,000
August 26
3,000
October 5
4,000
November 17
4,000
December 12
4,000
$39,000
1945
August 13
$ 2,000
August 31
8,000
November 13
3,000
$13,000
1946
June 14
$ 1,000
June 17
1,000
$ 2,000
1947
January 14
$ 3,000
January 21
2,000
$ 5,000
$90,000
Series "E" Bonds
1944
$ 75
1945
3,975
$ 4,050
$94,050
On January 27, 1947 a special agent and an internal revenue agent interviewed petitioner regarding the tax liability of the Brewer Company and the activities of Pinckney P. Brewer. The latter had placed *290 bets with petitioner in 1943 and 1944. Checks received from Brewer were endorsed by petitioner and cleared through his account at Central Trust Company. On or about July 1, 1947 petitioner employed James H. Cleveland, one of the attorneys of record herein, to handle his income tax problems. He had never filed an income tax return and so advised his counsel. Having had no regular business or income he stated that he thought he was not amenable to the income tax laws, but that realization had come to him some five or six years previously that he was subject to income tax liability. His advanced age and his interest in providing a college education and financial support for the adopted son of some friends had caused him to seek the advice of counsel in settling his tax liability. Cleveland conferred with government representatives about Bennett's tax liability. He was informed that a full, voluntary disclosure by petitioner would, in line with government policy, relieve Bennett of criminal prosecution. It was decided that it would be impractical to reconstruct petitioner's taxable income prior to the opening of his bank accounts. The government's representative, Earl Martin, suggested *291 that petitioner's bank accounts, deposits and disbursements, should be analyzed in reconstructing his taxable income for 1933 and subsequent years. In reconstructing his taxable income petitioner adopted the suggested method. In computing his tax liability he conceded that he was liable for interest and for the 25 per cent addition for delinquent filing for each year, but denied that he was liable for the 50 per cent addition for fraud with intent to evade tax.
Upon the advice of counsel petitioner employed Fred T. Cramer, a lawyer-accountant, to determine his taxable income and his tax liability for the taxable years. Cramer used petitioner's bank books, check stubs, canceled checks, some of which were missing, and information furnished by Bennett in reconstructing taxable income for the taxable years. In reliance upon Bennett's positive statement that he had no income for 1945 or 1946, except income from government bonds, Cramer allocated deposits for 1945 and 1946 totaling $17,442.35 to the calendar years 1933 to 1944, inclusive, in the proportion that each year's deposits bore to the total deposits for the 12-year period. Cramer estimated petitioner's living expenses at $1,200 per *292 annum and added this sum each year in reconstructing Bennett's taxable income. Cramer computed petitioner's income tax liability on each year's reconstructed taxable income, added thereto 25 per cent for failure to file a timely return, and computed interest from the due date to July 30, 1947, in determining petitioner's tax liability for each taxable year. Cramer's computation of Bennett's taxable income for each year is as follows: Estimated
Total
Cash *
Deposits ** *293 Living
Estimated Tax-
Year
Deposited
Allocated
Expenses
able Income
1933
$ 3,939.70
$ 1,259.18
$ 1,200.00
$ 6,398.88
1934
802.40
256.46
1,200.00
2,258.86
1935
2,416.10
772.22
1,200.00
4,388.32
1936
4,015.67
1,283.47
1,200.00
6,499.14
1937
6,285.84
2,009.04
1,200.00
9,494.88
1938
11,324.21
3,619.38
1,200.00
16,143.59
1939
4,909.22
1,569.06
1,200.00
7,678.28
1940
3,328.05
1,063.69
1,200.00
5,591.74
1941
4,769.81
1,524.43
1,200.00
7,494.24
1942
7,071.82
2,260.25
1,200.00
10,532.07
1943
2,191.35
700.39
1,200.00
4,091.74
1944
3,519.19
1,124.78
1,200.00
5,843.97
1945
1946
Totals
$54,573.36
$17,442.35
$14,400.00
$86,415.71 On or about July 30, 1947, petitioner executed income tax returns for the calendar years 1933 to 1946, inclusive. The returns reported the taxable income for each year as shown in the above table, plus $1,750 and $2,100 for the years 1945 and 1946, respectively. The income tax liability, interest to July 30, 1947, the 25 per cent addition for delinquency in filing the returns, and total liability for each year reported on the income tax returns were as follows: 25% Ad-
Year
Tax
Interest
dition
Total
1933
$ 275.90
$221.40
$ 68.98
$ 566.27
1934
41.32
30.68
10.33
82.33
1935
123.53
84.30
30.88
238.71
1936
267.93
166.78
66.98
501.69
1937
537.49
302.32
134.37
974.18
1938
1,296.67
651.53
324.17
2,272.37
1939
369.04
163.29
92.26
624.59
1940
239.63
88.21
57.66
376.50
1941
936.73
302.06
234.18
1,472.97
1942
645.32 *
645.32 *
1943
2,779.46
562.74
694.86
4,037.06
1944
1,204.75
171.63
301.19
1,677.57
1945
185.50
15.30
46.38
247.18
1946
87.11
1.96
21.77
110.84
$13,827.58 petitioner paid the collector $13,848.86 [1] as income taxes, interest, and 25 per cent in addition to the tax for each of *294 the taxable years. Immediately thereafter respondent's agents began an investigation to verify petitioner's tax liability. The contents of petitioner's safety deposit box were inventoried on or about September 4, 1947, by petitioner and two of respondent's agents. At that time the safety deposit box contained approximately $10,710 cash, $75,000 in "G" bonds, $4,300 in "E" bonds, a deed to 1967 Garden Lane Place, an unrecorded deed from Zussman Knoeffer to petitioner, and petitioner's last will and testament. The difference between the bonds purchased and the amount inventoried represented bonds cashed by petitioner to pay the $13,848.86 tax liability. Respondent's agents were unable to reconcile the taxable income reported by petitioner with the bond purchases made by him during the taxable years 1941 to 1946, inclusive. Petitioner's lack of records and his inability to satisfactorily explain the source of the funds used to make the bond purchases convinced respondent that petitioner's *295 taxable income was not correctly reflected by his income tax returns. Respondent accepted the taxable income reported on petitioner's returns for the years 1933 to 1941, inclusive, but recomputed petitioner's taxable income for the years 1942 to 1946, inclusive, by the progressive increase in net worth method as follows: Assets
1941
1942
1943
1944
1945
1946
Cash
$10,710.00
$10,710.00
$10,710.00
$10,710.00
$ 10,710.00
$ 10,710.00
U.S. Treasury Bonds: Series "G"
18,000.00
31,000.00
70,000.00
83,000.00
85,000.00
Series "E"
281.25
281.25
281.25
356.25
4,331.25
4,331.25
Real Estate: 1967 Garden Lane
5,073.00
5,073.00
5,073.00
NET WORTH
$10,991.25
$28,991.25
$41,991.25
$86,139.25
$103,114.25
$105,114.25
Net Worth Increase
18,000.00
13,000.00
44,148.00
16,975.00
2,000.00
Cost of Living: Expenditures by checks on Fifth-Third
Union Trust Co.
2,035.88
1,341.30
2,037.48
3,187.36
2,847.95
Expenditures by checks on Central
Trust
526.50
268.13
246.63
818.57
871.78
Est. cash expenditures
1,200.00
1,200.00
1,200.00
1,200.00
1,200.00
Total Cost of Living
$ 3,762.38
$ 2,809.43
$ 3,484.11
$ 5,205.93 4,919.73
Total net worth increase and cost of liv-
ing
$21,762.38
$15,809.43
$47,632.11
$ 22,180.93
$ 6,919.73 On October 28, 1947 the deficiencies, additions, and interest determined *296 by the respondent for the years 1942 to 1946, inclusive, were made the subject of a jeopardy assessment against petitioner and warrants of distraint were issued. On or about November 5, 1947 demand was made on petitioner at his residence for payment of the jeopardy assessment. Petitioner requested permission to confer with his counsel, and it was agreed that Bennett would meet respondent's representative at his counsel's office at 2:30 P.M. Respondent's representative left petitioner's residence at 11:50 A.M. At 12:52 P.M. of the same day, Bennett visited his safety deposit box and removed part of its contents. At the afternoon meeting in Cleveland's office respondent again demanded payment which was vigorously refused. Liens were immediately filed by respondent against petitioner's bank accounts, and his safety deposit box was sealed. Bennett delayed accompanying respondent's agents to open the sealed deposit box and remove the contents for several weeks. Finally he informed respondent that the box was empty and there was no need to go to it. Upon respondent's insistence Bennett and Cleveland were present when the safety deposit box was opened and found to contain only Bennett's last *297 will and testament and the unrecorded deed. Upon further demand for payment petitioner and his counsel refused and have since consistently refused to satisfy the petitioner's tax liability or to disclose the location of any of his assets. Respondent realized slightly more than $2,000 from the bank account at Central Trust Company and slightly more than $3,000 from petitioner's other bank account. No other sums have been received or applied on the deficiencies herein although repeated demands have been made on Bennett. From about 1923 to 1935 petitioner resided with Zussman Knoeffer and his wife. Petitioner and the Knoeffers became warm friends. From time to time he loaned Knoeffer various sums of money. In or about 1928 he loaned Knoeffer $1,000, in 1935 or 1936 about $1,500 to set Knoeffer up in business, and in 1945 around $5,500 to pay off the mortgage on 1967 Garden Lane, where the Knoeffers resided. During 1942 and 1943 Knoeffer was ill and unable to work and Bennett was advancing a little money to Knoeffer all the time. Knoeffer estimated the total of each year's advances as over $1,000. Except for the Garden Lane transaction no notes or evidence of indebtedness were given by *298 Knoeffer to petitioner. A portion of the advances were repaid but neither petitioner nor Knoeffer knew the amounts repaid or the balance due. In 1932 the Knoeffers adopted a boy in whom petitioner took great interest. Petitioner has paid all of the boy's expenses since about 1934. At the time of the hearing this boy was 16 years of age. Petitioner estimated that his real living expenses during the years 1933 to 1945 would average $2,000 to $2,500 per year, and that he gave away a good deal more than he used for himself. For each of the taxable years herein petitioner failed to make and file a timely income tax return as required by law. For each of the taxable years herein a part of the deficiency was due to fraud with intent to evade tax. Opinion ARNOLD, Judge: The principal difficulty with this case is the lack of evidence from which petitioner's taxable income can be computed. Petitioner maintained no records or accounts that would clearly reflect his income for any of the taxable years. Although he testified to accumulated earnings of $18,000, by 1920 petitioner made no attempt to estimate his income prior to 1933, nor did respondent. This is undoubtedly due to the fact that petitioner *299 opened bank accounts in that year, the use of which afforded some tangible basis for reconstructing taxable income in the years 1933 to 1946, inclusive. We note here that petitioner's failure to keep books and records was a matter of his own choosing, prompted perhaps by the illegal nature [2] of his adopted profession. Be that as it may, the law imposed the duty upon him to file an income tax return for each year and to report thereon, fully and honestly, every item of gross income received by him. Louis Halle, 7 T.C. 245, 249. To meet this requirement he must maintain adequate records from which his correct income can be determined. Estate of Robert Lyons Hague, 45 B.T.A. 104, 109, affd., 132 Fed. (2d) 775, 776, cert. denied, 318 U.S. 787; and in the absence of such records his income must be determined or verified from whatever sources and records that are available.
Our findings show that petitioner's counsel and respondent's representatives agreed that for the taxable years, in preparing tax returns, petitioner's taxable income should be computed upon the basis of bank deposits. The representatives were agreed *300 that the petitioner should pay interest and the 25 per cent addition for failure to file timely tax returns for each year, but they disagreed with respect to the 50 per cent addition for fraud with intent to evade tax. The petitioner reported taxable income for each of the taxable years upon the bank deposit basis as suggested by respondent. He now contends that respondent is bound by the end result of his own suggestion, particularly where respondent accepted the results for the taxable years 1933 to 1941, inclusive, but rejected them for the years 1942 to 1946, inclusive. This contention ignores one of the principal obligations placed upon respondent by the Congress with respect to income tax laws, namely, "As soon as practicable after the return is filed the Commissioner shall examine it and shall determine the correct amount of the tax." Section 57, Internal Revenue Code [Italics supplied]. In point is the following language from our opinion in Louis Halle, supra: "* * * The Commissioner need not accept, as complete, correct, and accurate, the returns filed or the sworn statement of the taxpayer that his returns completely and correctly disclose his tax liability. The Commissioner *301 has authority to check the returns against the records of the taxpayer and, if no records have been kept or if the records are incomplete, inaccurate, or otherwise unsatisfactory, he may seek information elsewhere to discover, assess, and collect the full tax liability imposed by law. * * *" The respondent set about verifying petitioner's returns immediately after they were filed. His acceptance of the tax liability (except for the fraud issue) reported for the years 1933 to 1941, inclusive, means simply that he determined tax liability in the amount reported and sworn to by petitioner for each of said years, the fraud issue excepted. As to the other five taxable years respondent determined that petitioner's returns did not accurately, completely, and correctly disclose his tax liability in that taxable income for the years 1942 to 1946, inclusive, did not adequately reflect bond purchases made by petitioner during each of such years. Where a taxpayer keeps no books of account or the method of accounting employed does not clearly reflect income, section 41, I.R.C., authorizes respondent to make a computation which does, in his opinion, clearly reflect the income. Respondent determined *302 that petitioner's taxable income for the years 1942 to 1946, inclusive, would be clearly reflected by the use of the increase in net worth method. This Court and other courts have repeatedly recognized that under certain circumstances taxable income may be determined by one of two methods (a) analysis of bank deposits, [3] or (b) increase in net worth. n 4 The decided cases show no preference for one method over the other. Nor should they state a preference, for the test is not to choose between two methods of computing taxable income, but which method of accounting more clearly reflects net income. The respondent has determined that the increase in net worth method clearly reflects petitioner's net income and the latter must overcome the prima facie correctness of that determination if he is to prevail. Lacking records to substantiate the taxable income reported on his income tax returns petitioner must depend upon his own testimony. The record reveals that petitioner's testimony *303 is weakened by self-serving and at times contradictory statements. We have found that Bennett furnished Cramer with the information used in preparing the tax returns, that Bennett accepted the income reported, that he executed the returns as correctly reflecting his income for each year, and that he paid the tax liability shown thereon. Yet, on the witness stand, he repudiated Cramer's computation as "an absolutely erroneous method," and stated that his taxable income for the year 1942 "was nothing like $10,000 that year." Also petitioner accepted the $1,200 estimate of yearly living expenses used in Cramer's computation of his taxable income. Yet he stated in his deposition that his average living expenses during the years 1933 to 1945 were: "Well, I'd say between two and three thousand dollars a year maybe two thousand, twenty-five hundred something like that, * * *." He further stated in his deposition: "I give away a good deal more than I use myself I promise you." Petitioner was asked specifically if he could allocate his accumulated winnings, which he carried on his person or deposited in his safety deposit box, to the years in which he had won the money. He admitted that he *304 could not make such an allocation, but denied that the bond purchases in the years 1942 to 1946 were made from his winnings in such years. Petitioner's unsupported generalizations are insufficient to carry the burden of proof placed on him by respondent's determination. While the evidence before us is not conclusive, it is sufficient to support the conclusion that petitioner used winnings in the taxable years 1942 to 1946, inclusive, to purchase government bonds. The evidence is insufficient to conclude that petitioner's bond purchases were out of accumulated winnings. The number of purchases made over the five-year period strongly suggest that winnings were used in making some of the purchases. The inference drawn by the respondent is supported by the record, and in the absence of more specific facts as to petitioner's annual income we approve respondent's method of determining petitioner's taxable income for each of the years 1942 to 1946, inclusive. The question of whether there was fraud with intent to evade tax is presented in each taxable year. For the years 1933 to 1941, inclusive, this is the only question at issue. Respondent accepted the tax payment made by petitioner with *305 his tax returns for such years, and then determined that the 50 per cent addition to the tax should be added for fraud as provided by statute. The mailing of a deficiency notice setting forth his determination is proper statutory procedure and confers jurisdiction upon this Court. Gutterman Strauss Co., 1 B.T.A. 243; G. S. Patterson, 16 B.T.A. 716; Maitland A. Wilson, 7 T.C. 395; Thomas J. McLaughlin, 29 B.T.A. 247. Respondent has the burden of proving fraud. Direct proof of a fraudulent intent to evade tax is seldom available. Such intent must usually be gleaned from the acts and conduct of the taxpayer. Respondent's evidence of fraud must be clear and convincing if he is to prevail. A mere preponderance of evidence will not suffice. M. Rea Gano, 19 B.T.A. 518, 532; Leonard B. Willits, supra; Pincus Brecher, supra. One fact that stands forth in respect to the fraud issue is petitioner's long continued failure to file income tax returns. He pleads ignorance and inadvertence by stating that since he had no regular business or income he did not realize that he was amenable to the income tax laws. Yet, he testified that he became aware of his liability some three or four years *306 before he filed his returns. Certainly, as to these years he intentionally refused to report his income and pay the tax imposed by law. Petitioner's own testimony is to the effect that he accumulated between $32,000 and $42,000 during the 16 year period 1920 to 1936, for he testified that he had somewhere between $50,000 and $60,000 when he discarded his money belt and put the cash in his safety deposit box. Thus, by his own admission he was saving $2,000 or more per year over and above his living expenses plus what he gave away, which he says was more than what he spent on himself. If he spent $2,000 on himself, gave away an equal amount, and saved $2,000 per annum his income was at least $6,000 per year. In M. Rea Gano, supra, we said, p. 533: "A failure to report for taxation income unquestionably received, such action being predicated on a patently lame and untenable excuse, would seem to permit of no difference of opinion. It evidences a fraudulent purpose." Here there can be no doubt that petitioner had taxable income in each of the years before us. He admits it by the returns he has filed. His excuse for his conduct is ignorance up to 1942 or 1943; after that even this excuse *307 was no longer available. His proof consists of his own unsupported, self-serving statements with inconsistencies and contradictions heretofore mentioned in part. We are unable to accept his excuse or his testimony. [6] While it may well be true that some of the bond purchases were made with accumulated income, we have no doubt but what income was used in each year in making the purchases. The addition to the tax for fraud applies if any part of the deficiency is due to fraud with intent to evade tax. It is clear, and we hold that petitioner's conduct was fraudulent with intent to evade tax as to each of the years in question. Decision will be entered for the respondent. Footnotes
*. Includes U.S. bond interest not deposited of $137.50 for 1942, $450.00 for 1943, and $912.50 for 1944. ↩
**. 1945 deposits were $14,265.50; 1946 deposits were $4,926.85, U.S. bond interest therein was: 1945, $375; 1946, $1,375. Amount to be allocated, $17,442.35.
*. Represents 25 per cent of 1942 income tax of $2,581.28 shown on line 17, page 4 of 1943 income tax return.↩
1. The difference between the total liability shown on the tax returns and the total amount paid by petitioner apparently represents interest to August 15, 1947 instead of July 30, 1947 as computed on each return.↩
2. Pages, Ohio General Code, Vol. 10, sections 13058, 13059 and 13065.↩
3. Leonard B. Willits, 36 B.T.A. 294; Arthur M. Slavin, 43 B.T.A. 1100, affd., 129 Fed. (2d) 329; Russell C. Mauch, 35 B.T.A. 617, affd., 113 Fed. (2d) 555; Pincus Brecher, 27 B.T.A. 1108; Hague Estate, supra.↩
6. See Ollie v. Kessler, 39 B.T.A. 646, 653↩ and cases there cited.