Redge Fowel v. Commissioner.
Fowel v. Commissioner
Docket Nos. 14611, 16239.
United States Tax Court
1950 Tax Ct. Memo LEXIS 43; 9 T.C.M. (CCH) 1038; T.C.M. (RIA) 50281; November 17, 1950
*43 1. For failure to prove error, respondent's determination of income approved. 2. Fraud penalty approved. 3. Negligence penalty in addition to fraud penalty for year 1942, approved. John F. Donelan, Esq., Munsey Bldg., Washington, D.C., for the petitioner. E. M. Woolf, Esq., for the respondent. VAN FOSSAN Memorandum Findings of Fact and Opinion The respondent determined deficiencies in the petitioner's income tax liabilities, and penalties, as follows: 50%
25%
Year
Deficiency
Fraud Penalty
Negligence Penalty
1940
$ 100.58
$ 50.29
1941
731.09
365.55
1942
1,611.74
805.87
$ 418.94
1943
2,020.04
1,010.02
1944
7,387.11
3,693.56
1945
2,753.88
1,376.94
Docket No. 14611 embraces the years 1940 to 1943, inclusive. Docket No. 16239 embraces the *44 years 1944 and 1945. In all instances calendar years are involved. The issue is whether the petitioner's income tax returns properly reflect his net income for the years 1940 to 1945, inclusive, and if they do not, whether the respondent erred in imposing the penalties. Findings of Fact The petitioner, Redge Fowel, is an individual now residing in Washington, D.C. From 1929 to 1932 he served as a constable in Michigan. He is not certain what his occupation was during the years 1933 to 1938. He did many different things. In 1938 the petitioner came to Washington, D.C. The Orchid Flower Shoppe, then located at 901 15th Street, N.W., Washington, D.C., was in serious financial straits. Despite the fact that Fowel had no knowledge of the flower business at that time, he was prevailed upon to take over and operate it. In April of 1942, the business was moved to 1509 K Street, N.W., where it was continued for the remainder of the period here involved. The petitioner conceived the method of accounting that was used. His wife, Bessie Fowel, worked with him and was primarily responsible for keeping the records from day to day. In addition, the petitioner employed Reginald Leicear *45 as a clerk. Leicear was in his employ from June, 1943, throughout the remainder of the period involved. His wages for 1944 amounted to $1,456. At no time during the years involved did petitioner or his wife draw a regular salary. The method practiced in keeping the books resulted in daily, monthly and annual summaries of net cash gains and net cash losses. The detailed records from which the various recapitulations were derived have been destroyed except for a so-called "Day Book" covering the period October 13, 1945, to December 31, 1945, inclusive. The daily and monthly summaries of net cash gains and losses prior to the year 1944 have been lost or destroyed. The net cash gain or loss as shown by the monthly and annual recapitulations was reported in Redge Fowel's Federal income tax returns for the years 1941 to 1945, inclusive. The net taxable income as shown in this recapitulation and reported in these returns, with tax paid, is as follows: Reported
Tax
Year
Income
Paid
1941
$1,805.19
$ 23.30
1942
1,686.49
64.00
1943
1,718.46
100.84
1944
322.15
0.
1945
1,615.50
119.00 The records upon which the 1940 income tax return is based have been *46 lost. The income reported for 1940 was $1,804.39 and no tax paid. None of these returns is factually complete. Petitioner did not sign the 1942 return bearing his name and testified that he did not believe he had seen it before. This return is on Form 1040-A. In Schedule C of the 1944 return, petitioner reported total receipts of $4,186.05, merchandise bought for sale $3,163.90, labor $700 and net profit from business $322.15. In addition to income derived from his flower business, the petitioner derived certain small amounts of rental income throughout the period involved. In 1940 a portion of the business premises was rented to the McDonald Typewriter Company. During all the other years he rented rooms in his apartment. From this latter source he received $192 in 1942 and $240 in 1945. In 1944 he received $15.01 in interest, and admits failure to report $13.35 thereof. The petitioner maintained a checking account at the American Security & Trust Company during the years 1940 to 1945, inclusive. His wife, using her maiden name of B. M. McDonald, at all times had power of attorney for this account. In 1944 Fowel established checking and saving accounts at the Security Savings & *47 Commercial Bank. Most of petitioner's expenses, together with purchases of flowers, were paid by cash or by endorsing checks received by him from his customers. Cash purchases and expenses paid by cash did not go through his bank accounts. All the time he was in business petitioner made it a practice to pay his wholesale florist bills by endorsing, over to his wholesalers, the checks which he had received. If these did not fully meet the bill, he would add cash to it. During the years here involved he made bank deposits and disbursements as follows: DEPOSITS AND CHECK DISBURSEMENTS TO CHECKING
AND SAVINGS ACCOUNTS OF PETITIONER
DEPOSITS
1940
1941
1942
1943
1944
1945
American Security & Trust Co. -
Checking Accounts
$5,918.00
$10,673.18
$14,081.44
$15,217.64
$16,184.56
$14,267.84
Security Savings & Commercial
Bank - Checking Account
3,768.42
863.88
Security Savings & Commercial
Bank - Savings Account #20615
3,000.00
13.75
(Int.)
DISBURSEMENTS
American Security & Trust Co. -
5,553.48
9,846.35
12,927.02
17,571.99
16,389.47
14,226.15
Security Savings & Commercial
Bank - Checking Account
3,577.15
American Security & Trust Co. -
Balance as of January 1
543.65
797.27
1,858.14
2,913.01
552.66
349.79
Security Savings & Commercial
Bank - Checking Account -
Balance as of Jan. 1
0.
0.
0.
0.
0.
191.27
Security Savings & Commercial
Bank - Savings Account - Bal-
ance as of Jan. 1
3,000.00
*48 As far as could be ascertained from various known wholesale suppliers, the cost of purchases for the years involved is: COST OF GOODS SOLD TO ORCHID SHOP
SOURCE
1940
1941
1942
1943
1944
1945
Paul's Wholesale
Florist Co.
1)
1)
$ 312.35
$1,989.35
$ 612.27
$ 2,794.00
Washington Florists'
Exchange
0
0
49.75
4,605.18
7,749.54
8,888.60
American Decorative
Flower Co.
1)
1)
1)
1)
1)
1)
A. Gude Sons Co.
460.25
986.16
851.21
The McCallum Sauber
Company
450
145.10
1,151.40
931.60
657.85
1,425.00
Berwick Gardens
51.55
116.40
235.96
256.91
262.51
S. H. Pennock Co.
0
0
0
0
0
0
District Wholesale
Florist, Inc.
0
0
0
0
250.00
250.00
Kramos & Tooker,
Inc.
0
0
0
0
548.90
191.65
Total $450
$196.65
$1,629.90
$8,222.34
$11,061.63
$14,662.97
Note: 1) Unavailable. Two wholesalers kept no record of cash purchases made by the petitioner. Cash purchases are not included in the above table. In June, 1944, a Special Agent of the Bureau of Internal Revenue began an investigation of the petitioner's returns and the operation of the Orchid Flower Shoppe. This Agent requested that he *49 be allowed to inventory Fowel's safety deposit box. Fowel requested delay but accompanied the Agent to the American Security & Trust Company, where they arrived shortly after business hours and were unable to gain access to the safety deposit box. Shortly thereafter the Agent was sent to West Virginia on official business. Upon his return to Washington, he was inducted into the Armed Forces of the United States. He returned to duty with the Bureau of Internal Revenue on April 3, 1946. He immediately resumed his investigation. He again attempted to arrange for the opening of the petitioner's safety deposit box. Petitioner responded that he was busy. He wanted a 48-hour delay. Pursuant to a prearranged plan with certain of the bank officials, the Agent was notified promptly the next morning that Fowel had entered his safety deposit box. The Agent went immediately to the bank but petitioner had left. Thereafter the Agent made no further attempt to inspect the contents of the box. In May, 1946, he inspected the available records of the petitioner. In the accounting system employed by the petitioner and his wife for the Orchid Flower Shoppe, gross receipts could have been obtained only *50 from the individual slips and daily records of transactions. These slips and records were lost or destroyed. Consequently, the respondent attempted to determine the petitioner's gross income in some years on the basis of bank deposits, and in 1944 and 1945, on the basis of the available records. For the years 1940, 1941, 1942 and 1943, respondent determined petitioner's taxable income to be 25 per cent of gross business receipts and adjusted petitioner's income accordingly. For the two years 1944 and 1945 he determined gross receipts of the petitioner according to his books by application of the following procedure: Net cash gains as shown in the so-called year book, plus net cash losses as shown in this year book, during each of those years, equalled gross receipts for each of those years. The resultant figures for gross receipts were: 1944
$38,699.09
1945
36,881.42
Bank deposits for these two years, as set out above, were: 1944
$19,952.98
1945
15,306.96
During 1944 and 1945, the petitioner purchased four boats, which he intended to rent to fishing parties during the summer months. These boats were purchased at various prices ranging up to *51 $1,700 each. The cost of some of these boats was charged to the business and went through the cash register as a "paid out." The notice of deficiency in Docket No. 14611 is dated March 14, 1947. The petitioner's income tax returns were filed with the collector of internal revenue at Baltimore, Maryland on the following dates: 1940 return on
March 15, 1941
1941 return on
March 16, 1942
1942 return on
March 15, 1943
The 1942 return is on Form 1040-A and is unsigned. A tax of $64 was paid thereon. The respondent has determined the petitioner's income for the years involved, as follows: 1940
$ 4,585.94
1941
7,302.29
1942
8,379.14
1943
9,019.79
1944
20,628.78
1945
11,278.07
The income tax returns filed by petitioner for the years 1940 through 1945 were false and fraudulent with intent to evade tax. For the year 1942, the petitioner failed to file a sufficient income tax return within the meaning of the Internal Revenue Code. Opinion VAN FOSSAN, Judge: The evidence in these consolidated cases presents us with numerous conflictions. We are confronted with irreconcilable divergencies in testimony. On several occasions petitioner *52 contradicted himself in making different statements respecting the same subject matter. In some instances two or three or more different explanations appear where only one can be correct. Such inaccuracy and unreliability can lead to but one conclusion. We are able to place but little credence in the testimony of the petitioner even when uncontradicted unless supported by competent corroborative evidence. The petitioner came to Washington, D.C. from Michigan in 1938. He was prevailed upon to take over and operate the Orchid Flower Shoppe, which, at that time, was in serious financial straits. He apparently was accountable to no one and the record is not clear as to whether or not he invested any money in the business. He devised and instituted the system of accounting that was used. His wife joined him and became primarily responsible for the day-to-day maintenance of the records. She testified as to the procedure employed by her. In support of her testimony, the petitioner submitted in evidence a copy of the so-called year book which purported to be the annual summaries and recapitulations of the business for the years 1941 through 1945. Also introduced is a book purporting to *53 be the monthly summary for the period January 1, 1944, through December 31, 1945. The only other record produced is the socalled day book covering the two and onehalf month period from October 1, 1945, through December 31, 1945. The records and the evidence submitted are insufficient to give us more than a nebulous idea of what was being attempted in the way of bookkeeping. One thing stands out, - petitioner's correct income cannot be ascertained with any assurance of accuracy from his records alone. Since petitioner failed to keep adequate books and records from which his income could be determined, it was necessary and proper for the respondent to compute income on the basis of best information available. For the first four years involved, he computed petitioner's income on the basis of bank deposits and gross receipts, determined as best he could, to which he applied a percentage of 25 per cent to obtain profits. For 1944 and 1945 he used similar sources and employed a procedure based on the assumption that the petitioner had no reserve funds. The petitioner claims that his bank deposits exaggerate the actual receipts from the business and that, therefore, they are not a proper *54 basis for determining his income. He and his wife have both testified that as an accommodation to customers and prospective customers he frequently would deposit their checks in his accounts for collection with later delivery of the proceeds, and that he in turn would deliver the proceeds to the customer. In consequence, he claims these deposits do not accurately portray the business receipts. This may or may not be true, but there are not sufficient details or corroboration of petitioner's claim to enable us to find such to be the fact. The evidence shows that most of petitioner's expenses, including purchases of flowers, were paid by cash or by checks received by him from his customers, which cash purchases and expenses paid by cash did not go through his various bank accounts. All the time he was in business the petitioner made a practice of paying his wholesale florist bills by endorsing over to his wholesalers the checks he had received. If these did not fully meet the bill, he would add cash to make up the balance. As a result, these bank deposits, if anything, do not show the full receipts of the business. Petitioner asserts that the method employed by the respondent in determining *55 his income for 1944 and 1945 is fundamentally erroneous, because the underlying assumption is false. In his testimony the petitioner claimed that he had between $8,000 and $10,000 in reserve funds at the time he first came to Washington; that this amount represented savings from his income derived during the two terms he served as a constable in Michigan; and that he never deposited these savings in a bank because of his distrust of banks. He claims he used this fund as the source of money from which he paid the day-to-day living expenses and financed other business ventures in which he participated. He does not reveal where he kept this fund and his extensive use of the facilities of two banks during the period here involved does not support his claim of distrust of banks. We are unable to accept or believe the reserve fund story. On the record made, it is very clear that petitioner received income in the years involved much in excess of that which he reported. Certain it is that petitioner, on whom rested the burden of proof, has not overcome the presumption of correctness attached to the respondent's determination. We hold, therefore, that petitioner has not proved the respondent *56 to be in error in the determination of the deficiencies involved herein. We turn now to the question of penalties. The respondent charges that for each of the tax years 1940 through 1945, petitioner filed a false and fraudulent return with intent to evade tax. Proof of fraud must be clear and convincing. To establish fraud by direct proof of intention is seldom possible. However, this Court has held that a failure to report income undoubtedly received, such failure being due to a patently lame and untenable excuse, evidences a fraudulent attitude of mind. M. Rea Gano, 19 B.T.A. 518; Charles E. Mitchell, 32 B.T.A. 1093, affirmed 303 U.S. 391. Here there is little support for petitioner in the evidence. The whole record considered, and having seen and studied the witnesses on the stand, we are clearly convinced that petitioner knowingly and fraudulently made false returns for each of the taxable years. Petitioner's conduct cannot be explained away as due to ignorance nor inadvertence. The attempt to defraud is too clear to be excused. After a painstaking study of the record and giving the petitioner the benefit of doubt, where doubt exists, *57 we are still clear in our minds that the omission of income received by petitioner from his returns for each of the years 1940 through 1945 was due to fraud with intent to evade tax lawfully due. In the Mitchell case, supra, we observed: "In this situation the trier of the facts is charged with the responsibility of passing on the credibility of the evidence. This duty involves the winnowing of the wheat of truth from the chaff of untruth - the sorting of the real from the seeming. This duty is not without its inherent difficulty. In cases such as this, almost without exception, the taxpayer testifies categorically to the purity of his motives and the absence of fraudulent intent. And if, on the whole record, he convinces those charged with decision of his forthrightness of purpose, his innocence of improper motive, the impenetrable honesty of his position - if neither contradictory circumstances nor inherent lack of probability weakens his credibility, he must prevail. On the other hand, if, after listening to the taxpayer's protestations of innocence and hearing his explanations of his conduct, the trier of the facts is unable to give such protestations full weight and such explanations *58 full credence, if on the whole record of fact, inference, and circumstance there abides in the mind of the trier a conviction, based on clear and convincing evidence, that fraud has been committed, then the decision must be against him. P. B. Fouke, 2 B.T.A. 219; L. Schepp Co., 25 B.T.A. 419." In the often cited Gano case we said: "Isolated instances of discrepancy or occasional lapses from the rigid accountability contemplated by the law might conceivably be overlooked, but where the whole fabric of petitioner's tax accounting is permeated with gross error, where elaborate artifice is employed to accomplish the end sought, where the evidence adduced in explanation on different occasions varies so as to make it all unreliable, where sworn statements are proven by records to be false, and where the errors both of law and of fact all tend to accomplish a reduction of apparent tax liability, the situation goes beyond mere fortuitous coincidence, or unintentional error. It evidences a purpose to evade. Without pausing to repeat the evidence that brings us to the conclusion that we have announced, be it said that all of the above conditions are present in *59 this case." Much so said as above might with perfect propriety be said in the instant case. There remains the question of the negligence penalty for 1942. The Form 1040-A, purporting to be petitioner's income tax return for the year 1942, is unsigned. Such a document does not constitute a return within the meaning of the Internal Revenue Code even though it is treated as such by a collector of internal revenue and a tax has been paid thereon. Theodore R. Plunkett, 41 B.T.A. 700, affirmed CA-1, 118 Fed. (2d) 644. For failure to file a return, such failure not being due to reasonable cause, a penalty of 25 per cent is mandatory. Section 291, Internal Revenue Code. This penalty is separate from the fraud penalty. Both the 25 percent penalty under section 291 and the 50 per cent penalty under section 293 (b) can be imposed. Pincus Brecher, 27 B.T.A. 1108; Arthur M. Slavin, 43 B.T.A. 1100. We hold that such was the case with regard to 1942 and affirm the respondent in his determination that both penalties should be imposed for that year. Decisions will be entered for the respondent.