## APPEAL OF P. B. FOUKE.

Docket No. 1910. Submitted May 15, 1925. Decided June 30, 1925.

Upon the evidence, *held*, that a transaction between the taxpayer and his wife, entered into in December, 1919, upon which a claim for a deductible loss is based, was not a *bona fide* sale.

*Henry J. Richardson, Esq.*, for the taxpayer.
*Robert A. Littleton, Esq.*, for the Commissioner.

Before JAMES, LITTLETON, and SMITH.

This is an appeal from a determination of a deficiency in income tax for the year 1919, in the amount of $44,410.49.

### FINDINGS OF FACT.

The taxpayer is an individual residing at St. Louis, Mo. During the taxable year in question he was the president of the International Fur Exchange, Inc., and was one of its principal stockholders.

In 1916 the taxpayer acquired 5,000 shares of the capital stock of the company for a total sum of $341,300. On or about December 19, 1919, he transferred to his wife, Virginia R. Fouke, 10,000 shares of the capital stock of the company, including the 5,000 shares above mentioned. Five thousand of the shares so transferred are conceded to have been a gift, and that transfer is not here in question. In exchange for the remaining 5,000 shares so transferred the taxpayer received from his wife a certain alleged promissory note due five years from its date and bearing no interest upon its face. The principal amount of the said promissory note was $250,000. The stock at that time was worth from $50 to $55 a share.

During the taxable year 1919 the corporation had been successful and had paid dividends of 6 per cent upon its capital stock. It was the expectation of the taxpayer and his wife that the dividends upon the entire 10,000 shares, transferred by him to her at the time above set forth, would be sufficient to pay the face of the note at its maturity. At the time of this transfer the taxpayer's wife had an independent fortune of some $75,000 to $90,000, and had an expectancy of an inheritance from her mother of some $200,000.

Thereafter, and during the taxable year 1920, the International Fur Exchange, Inc., suffered very large losses and became insolvent. Prior to such insolvency, the taxpayer had become indorser upon the notes of the corporation for an amount of approximately $23,500,000. In June, 1920, a creditors' committee, representing the banks holding the corporation's paper, took over the management of the corporation and undertook its liquidation. The corporation

has not been liquidated to this date. During the course of negotiations beginning in 1920 relative to the insolvency of the corporation, it was intimated to the taxpayer that he would not be required to make good upon his indorsement of the corporation's notes. There was no binding agreement to that effect at any time.

At the time of the transfer of the 10,000 shares of stock, heretofore mentioned, by the taxpayer to his wife, she indorsed the certificates in blank and redelivered them to him, together with her said note for $250,000. The note itself did not provide that the stock should be surrendered to the taxpayer as collateral to secure the payment of the note, and the stock so delivered was not attached by the taxpayer to the note, but all the papers were placed together in his safe-deposit box.

During 1921 the taxpayer, in the presence of his wife, destroyed the note for $250,000 which she had given him at the time of the transfer to her of the stock here in question.

In his income-tax return for the year 1919 the taxpayer, under the circumstances above set forth, claimed a loss on account of a sale of the stock in an amount of $91,300.

The Commissioner, in the audit of the taxpayer's return, disallowed the aforesaid claim for loss of $91,300, and determined the deficiency in tax resulting therefrom. From that determination the taxpayer brings this appeal.

### DECISION.

The determination of the Commissioner is approved.

### OPINION.

JAMES: The question presented in this appeal is whether the taxpayer, in December, 1919, actually and in good faith sold 5,000 shares of stock of the International Fur Exchange, Inc., to his wife. There is no question that such a sale, if made in good faith, would be valid and would result in the loss claimed to have been sustained by the taxpayer. There is no substantial question as to the amount of the loss sustained, if there actually was one. The stock was transferred at the then market value.

While there is no question that husband and wife may contract with each other—may buy from and sell to each other—in all such transactions the close relationship of husband and wife is, nevertheless, to be borne in mind, and such transactions are peculiarly subject to scrutiny when they involve the rights of third parties. This applies either to the rights of creditors or to the rights of taxing authorities. Husband and wife may not play fast and loose with their respective properties to the prejudice of creditors, nor may

they do the same thing to the prejudice of taxes which they properly owe to the Government.

In this case there are three significant facts which show conclusively, we believe, that the transaction here in question was not a total, complete, and valid sale when made. The first of these facts is the instantaneous redelivery of the stock in question, indorsed in blank to the taxpayer, with its attendant circumstances. The second is the peculiar form and character of the note given in exchange for the stock. The third is the destruction of the note when conditions changed, when the carrying out of the original plan would have rendered the transfer peculiarly disadvantageous to the wife.

Upon the first point it is clear that the wife of the taxpayer retransferred the stock indorsed in blank to him immediately after the transfer to her. This redelivery and indorsement was not accompanied by any contract in writing and the note given in exchange did not mention the terms under which the stock was surrendered to her husband. As between strangers, or between related parties engaged in a business transaction, such an arrangement is inconceivable. Between strangers there would have been a complete and full agreement in writing for the placing of the stock in escrow or in the hands of the taxpayer subject to the most stringent conditions with respect to redelivery upon the payment of the indebtedness created by its purchase. Here there was a mere delivery accompanied by indorsement in blank. Had the wife died prior to the payment of the note out of the dividends expected, the husband would have been in a position to repossess himself of the stock and to avoid all of the legal incidents which would flow from its inclusion in her estate. Had the taxpayer desired to sell the stock without the knowledge or consent of his wife, pledge it for his debts, or otherwise deal with it as his own, he was in a position to do so.

It is incredible that a transfer of a quarter of a million dollars worth of stock in the ordinary course of a business deal would be made under the conditions surrounding this transaction. Here an alleged sale is made, the sole consideration for it being a note for $250,000 given by a person at the time worth not to exceed $75,000 to $90,000, with no cash passing. The term of the note is five years. It bears no interest. While declared to have been absolute on its face it was, as is abundantly shown by the testimony, accompanied by an understanding that the entire purchase price would be paid out of the dividends from the stock.

Most significant are the subsequent events. Contrary to all the taxpayer's expectations, the stock thus surrendered to his wife instead of being a valuable security turned out to be worthless. The corporation became bankrupt. The taxpayer saw his personal

fortune melt away. He faced the possibility of being personally held upon indorsements of notes aggregating $23,500,000. He testified to the nervous strain under which he labored during that time. And then, in 1921, he destroyed the note. That story is best told by the record of his own testimony.

Q. What were your reasons for tearing that note up in 1921?

A. I did it to protect my family, for the reason I stated before, the loss and everything affected my health and I was under strain traveling between New York and St. Louis, and I did not know what might happen and I thought I had just as well destroy it.

Q. Did you think, had you met with an accident, that the banks would have carried out their intimation that they were going to release you, or that they would go back to your estate?

A. I don't like to cast any aspersions against the banks but I did not believe it would be done and I thought that I had only had an intimation from several of the committee individually, not as a committee, that they had no intention of holding us, in view of the fact that we had done everything to help them and had really done everything that could be done, and that practically all of us had put back into the business all the money that we had left, they decided not to put us into bankruptcy.

Q. Did you think, at that time, that if you had died, this $250,000 note of your wife's would be collectible at the instance of your administrator?

A. Undoubtedly it would have been, yes.

Realizing the liability of his estate to the banks, realizing the presence in that estate of a note for $250,000 upon which his creditors might collect from his wife, at least to the full extent of her private fortune, the taxpayer deliberately destroyed that note and destroyed that asset of his estate. If he regarded the note as a subsisting and valid obligation given to him in good faith, it is difficult to believe that he would, even under the nervous strain under which he was laboring, have deliberately done an act which constituted a fraud upon his creditors. For if this note was a valid obligation of his wife to himself it constituted a part of the assets to which his creditors had a right to look for the payment of his debts. In actual fear that his creditors would enforce his personal liability on his indorsement of the corporation paper, he destroyed the note. If the creditors had enforced their rights against him and had faced him with this transaction, what would have been his defense other than that the note was never given in the expectation that it would be paid, but was merely one of the steps in a device to avoid taxation on his income?

The taxpayer is voluble in his protestation that the transaction was an actual sale entered into in good faith between himself and his wife. But the facts of record in this case speak more eloquently as to the real nature of the transaction than any words of witnesses.

We are of the opinion that the transaction between the taxpayer and his wife was not a sale and that the determination of the Commissioner in this particular must be approved.