Sam Goldberg v. Commissioner. Sam Goldberg and Estate of Evelyn Goldberg, Sam Goldberg, Executor, v. Commissioner.
Goldberg v. Commissioner
Docket Nos. 43263, 43264.
United States Tax Court
T.C. Memo 1954-242; 1954 Tax Ct. Memo LEXIS 1; 13 T.C.M. (CCH) 1207; T.C.M. (RIA) 54347; December 31, 1954, Filed *1 1. Respondent's computation of income by means of the so-called cash expenditures method approved subject to certain adjustments. 2. Respondent erred in his determination of deficiency by failing to substitute the straight line depreciation method of accounting for the "inventory-cost of goods sold" method erroneously applied by the taxpayers for the years involved. 3. Petitioners allowed additional depreciation on certain rental property. 4. The amount of ordinary and necessary business expenses incurred by petitioner and decedent in each of the years involved, and the amount of real estate taxes paid by decedent in 1941, determined. 5. Held, respondent erred in including within the net taxable income of petitioner and decedent for the year 1939 an amount representing gain realized on a certain real estate transaction. 6. Held, some part of the deficiency in each of the years 1939-1943, inclusive, was due to fraud with intent to evade tax. W. R. Patterson, Esq., and Joseph B. Brennan, Esq., 1516 First National Bank Building, Atlanta, Ga., for the petitioners. Alben E. Carpens, Esq., for the respondent. VAN FOSSAN etermined a deficiency in income and victory tax of petitioner in docket No. 43263 for the year 1943 in the amount of $16,068.23 with an addition thereto for fraud in the amount of $8,034.12. By amendment to his pleadings, respondent now affirmatively seeks an increase in deficiency and an addition thereto in the amounts of $9,503.32 and $4,751.66, repectively, over and above his *3 original determination. Petitioner claims a refund for the year 1943. Docket No. 43264 involves a redetermination of deficiencies in income taxes and additions thereto for fraud determined by respondent in years and in amounts, as follows: Additions to
Tax Under
Year
Deficiency
Section 293(b)
1939
$ 553.47
$ 276.74
1940
1,724.19
862.10
1941
11,383.46
5,691.73
1942
7,623.99
3,812.00 Petitioners claim refund for each of the years 1940 and 1941. Certain adjustments made by respondent in both cases are not contested. Petitioners also concede several of the issues raised by the original pleadings as filed. The following questions remain to be resolved by us: (1) Whether gross receipts from business transactions during the taxable years 1939-1942, inclusive, were understated by Sam Goldberg and his wife in their joint returns for such years and whether gross receipts from business transactions during the taxable year 1943 were understated by the former in his separate return for that year. (2) Whether respondent used a proper method for determining the net taxable income of the taxpayers for each of the years 1939-1942, inclusive. (3) *4 Whether petitioners are entitled to additional allowances for depreciation on rental property in excess of those claimed and allowed. (4) Whether respondent erred in determining the amount of ordinary and necessary business expenses incurred by the taxpayers in each of the years 1939-1943, inclusive; and the amount of real estate taxes paid by Evelyn Goldberg during 1941. (5) Whether respondent properly included in the net taxable income of Sam and Evelyn Goldberg, for the year 1939, an amount representing gain realized on a certain real estate transaction. (6) Whether the income tax returns of Sam and Evelyn Goldberg for the years 1939-1942, inclusive, and of Sam Goldberg for the year 1943 were false and fraudulent and any part of the deficiencies here involved was due to fraud with intent to evade tax. (7) Whether section 6 of the Current Tax Payment Act of 1943 is applicable to discharge the income tax liability of Sam and Evelyn Goldberg for the year 1942. (8) Whether Sam Goldberg is liable for deficiencies in income and victory taxes and additions thereto for fraud in excess of those determined in the notice of deficiency, as claimed by respondent. (9) Whether petitioners *5 in docket No. 43264 are entitled to the refunds claimed for the years 1940 and 1941, and whether petitioner, Sam Goldberg, is entitled to the refund claimed by him for the year 1943. Findings of Fact The stipulation of certain facts filed by the parties with exhibits attached is, by this reference, made a part hereof. The petitioner in docket No. 43263 is Sam Goldberg, who filed his individual income and victory tax return for the year 1943 with the collector of internal revenue for the district of Georgia. The petitioners in docket No. 43264 are Sam Goldberg and the Estate of Evelyn Goldberg. Sam Goldberg (hereinafter referred to as petitioner) and Evelyn Goldberg (hereinafter called decedent) who died on November 18, 1950, prior to the issuance of the notice of deficiency herein, were, during the years involved, man and wife residing in Savannah, Georgia. They filed joint returns for the taxable years 1939-1942, inclusive, with the collector of internal revenue for the district of Georgia. During the years 1939-43, inclusive, and for several years prior thereto, petitioner was engaged in the business of operating various coin-operated amusement devices, such as music boxes, *6 games and slot machines, which devices he placed in stores, taverns, clubs and other establishments at various places throughout southeastern Georgia and South Carolina. The customers of such establishments operated the machines by inserting coins therein. The money thus collected was divided between petitioner and the owners of the establishments pursuant to agreement between them. In the course of his business petitioner employed a number of collectors who periodically visited the places where the machines were located, and, in the presence of the owner or operator of the establishment, unlocked the money compartment of each machine, counted the money therein, and turned over to the owner of each place such owner's agreed share thereof. Petitioner and/or his son frequently made such collections. The collectors incurred expenses in the course of their employment for gasoline, meals, lodging and similar items, which expenses they paid out of the proceeds of their collections. The collectors checked in periodically with decedent, and, on occasions when she was unavailable, with petitioner, who in turn would check in with decedent. When they checked in, the collectors were required *7 to account for the amount of the collections less the expenses they had incurred. Periodically, decedent would enter in a collections book the amount of collections turned in by each collector. Petitioner also employed a number of maintenance and repair men who looked after the repair and maintenance of the various amusement machines. Such repair men made visits to the various places where the machines were located to repair and service them. A considerable amount of repairing of machines also occurred in the workshop maintained by petitioner and the Novelty Amuse-U Company. The repair men had no regular routes. They went to the various locations when a particular machine needed repair, or when a new machine was being installed, or an old one being removed. In the performance of their duties the repair men incurred various expenses for travel, food, lodging, and similar items, for which they were later reimbursed. Decedent took care of the books and records. She was a graduate of New York University, where she had taken a course in Business Administration and had received a degree in accounting. She had a good knowledge of the principles of bookkeeping. During the years 1939 through *8 1943, inclusive, decedent maintained certain single entry records which included collections and disbursements books. A separate collections book was maintained for each of the years in question. In each such book there was kept a separate page for each week on which entries were made with respect to collections and certain expenses. Collections for each week were totaled on the page for that week. The weekly total was then posted to a summary page in the collections book showing the total collections for each week in the month. The weekly totals for each month were totaled on the summary page and the monthly totals then posted to the ledger sheets for collections. Collections from machines for the years here involved, as totaled on the books were, as follows: 1939
$64,241.22
1940
57,169.16
1941
61,082.47
1942
70,840.31
1943
71,497.65
The foregoing amounts were reflected on the income tax returns of petitioner and decedent for the years 1939 to 1943, inclusive. A correct total of such entires disclose $200 more collections from machines in 1939 and $1,000 less collections during the year 1943. The amount of expenses incurred by the collectors for gasoline, *9 meals, lodging and similar items, was also entered in the collections book. The entries of such expenses showed the name of collector and the amount spent by him. The amount of expenses incurred by the repair men for travel, food, and lodging and similar items, was also entered in the collections book. The entries of such expenses were variouly identified as "expenses" or "petty cash." Such entires were made in round numbers in generally identical amounts. They did not show the specific items of expenditure. Record of the salaries paid to the various employees was also kept. The entires of such salary payments showed the name of the employee and the amount paid. Such payments were generally made in cash. The various entries in the collections book with respect to expenses incurred by collectors, "petty cash," and salaries were totaled and posted to the summary page. The total amount of such expenses for each month was then posted to and entered in the disbursements book as a single entry at the end of each month. The disbursements book contained columns showing the various types of expenses, incurred in the business, under such headings as "Records and Supplies," "Auto Repairs," *10 "Miscellaneous Expenses," etc. The totals of such expenses, as shown by the books, were deducted on the Federal income tax returns filed for each year. Substantially all expenses for which entires were made were incurred in and related to operation of the business, although some of the items were nondeductible and some of the entries reflected the payment of personal taxes. The checking account which was used for the business was maintained at the Citizens and Southern National Bank, Liberty Street Branch, Savannah, Georgia, in the name of "E. M. Goldberg" for a part of the time during the years in question, and at some time during the years in question the name of the account was changed to "Novelty Amuse-U Company." Both petitioner and decedent had authority to draw checks on this account, and both of them did in fact draw checks on the account. Of the checks written, decedent wrote most of those for the business. Petitioner wrote some of the checks, the principal portion of those written by him being counterchecks. Entries were made on the check stubs with respect to such counterchecks either immediately following their being drawn or at the end of the month when cancelled checks *11 were received with the bank statement. The books and records, kept by decedent, were in her custody and she made all entries therein except for a period of approximately one month during which William Longwater made some entries in the disbursements book. Such books of account were kept on the cash method of accounting on a calendar year basis. Items entitled opening and closing inventories were reported on the tax returns of petitioner and decedent for the years in dispute, and used in the computation of gross and net profit reflected in such returns. The books purported to be kept on the so-called single entry system, and being loose-leaf were not of a permanent nature. These books so maintained by petitioner and decedent and the Novelty Amuse-U Company were never audited by their accountant and representative during at least the years 1937 through 1944. From the books it was impossible to make a reconciliation of cash with the bank account to ascertain what portion of total income was deposited to the bank account or what portion of collections was expended for any specific purpose without having first been deposited. Such records did not show the sources of income and currency. *12 No balance sheets or profit and loss statements were prepared or maintained and preparation thereof for the taxable years in question would not be possible without considerable verification. There were no proprietorship or investment accounts, no record of liabilities or accounts receivable or accounts payable and no complete record of assets. No complete file of invoices and receipts was kept. Entries were made in the books of expenditures with nomenclature making it difficult to ascertain what the payment represented. No formal records were maintained to show transactions concerning loans, both as to loan payments and loan repayments including such transactions as endorsed note loans and discounted notes. In their income tax returns filed for the year 1939 through 1942, petitioner and decedent reported net income in the following amounts: 1939
$ 2,845.64
1940
3,282.17
1941
9,152.69
1942
16,469.04
In his individual income and victory tax return filed for the year 1943, petitioner reported his income tax net income and victory tax net income for such year to be $21,798.70 and $23,135.12, respectively. Respondent determined the net income of petitioner and *13 decedent for the years 1939 through 1942 to have been as follows: 1939
$11,721.40
1940
17,688.89
1941
36,276.94
1942
30,608.24 Respondent determined that the income tax net income and victory tax net income of petitioner for the year 1943 were in the amounts of $45,833.20 and $47,595.62, respectively. In arriving at such determination, the respondent determined unreported receipts from the business of petitioner and decedent for the years in question by application of the so-called "Cash expenditures method" as follows: CASH EXPENDITURES METHOD (Summary of Bank Deposits Plus Cash Disbursements Compared to Accounted for Funds Received from All Sources) Items Included in Summary
Year 1939
Year 1940
Year 1941
Year 1942
Year 1943
Bank Deposits and Disbursements in
Cash: Bank deposits
$71,696.29
$64,067.60
$ 82,980.06
$ 74,158.40
$ 56,938.72
Cash used for business purposes and
not deposited
16,852.23
20,790.89
19,459.20
22,131.77
26,963.33
Payments on notes
657.50
688.34
4,313.35
1,731.02
800.00
Cash money loaned out
300.00
Payments on mortgages
720.00
Payments on real estate
1,780.00
250.00
2,500.00
24,189.87
Purchases of government bonds
75.00
1,593.75
9,250.00
Personal expenses paid for by cash
3,000.00
3,000.00
3,000.00
3,000.00
3,000.00
Total Cash Disbursed
$93,226.02
$90,326.83
$110,077.61
$105,114.94
$121,141.92
*14 CASH EXPENDITURES METHOD (Summary of Bank Deposits Plus Cash Disbursements Compared to Accounted for Funds Received from All Sources) Items Included in Summary
Year 1939
Year 1940
Year 1941
Year 1942
Year 1943
Accounted for Funds Received from All
Sources: Collection from machines
$64,241.22
$57,169.16
$ 61,082.47
$ 70,840.31
$ 71,497.65
Collections from rental property
3,000.00
3,421.90
3,385.17
3,849.93
5,630.72
Proceeds of loans from banks
6,294.00
7,424.00
11,690.00
8,400.00
Reimbursements to petitioners on en-
dorsed notes for which petitioners
had been charged and on other loans
previously made
12,866.12
10,601.90
8,331.05
10,945.18
8,330.55
Withdrawals from bank
200.00
110.00
365.00
Petty cash
1,740.00
2,620.00
1,580.00
2,170.00
2,650.00
Reimbursement on bad checks
81.05
64.35
Income from Est. of Jos. Goldberg
62.93
136.12
137.37
Proceeds from sales of auto equipment
1,900.00
Proceeds from sales of real estate
11,600.00
Total Received Funds Accounted for
$88,422.39
$81,411.31
$ 86,496.62
$ 96,341.54
$101,746.29
Unaccounted for Funds Received Repre-
senting Unreported Receipts from Busi-
ness
$ 4,803.63
$ 8,915.52
$ 23,580.99
$ 8,773.40
$ 19,395.65
*15 The use of the foregoing method required a determination with respect to each item of expenditure in each of the taxable years as to whether such expenditure was made by check or by currency. Subsequent to respondent's determination so made, a Certified Public Accountant, retained by petitioner in 1948, computed the net income of petitioner and decedent for the years 1939 through 1942, from their books and records, to be as follows: 1939
$ 4,670.31
1940
1,133.68
1941
1,115.39
1942
15,958.16 The same accountant likewise computed the income and victory tax net incomes of petitioner for the year 1943 to be $14,057.74 and $15,826.78, respectively. During the years involved, decedent maintained a checking account at the Liberty National Bank and Trust Company in Savannah, Georgia, which account was opened on June 17, 1938, and was active during the years 1938-1942, inclusive. The account became dormant in 1943. It was practically dormant in 1940 during which year there were no deposits and only three withdrawals. From the date it was opened through the years involved, deposits were made to the account on dates and in amounts, as follows: 1938
June 17
$9,000
July 29
400
Total
$9,400
1939
January 13
$ 500
July 7
250
Total
$ 750
1941
July 3
$ 10.00
September 11
1,000.00
October 14
303.76
October 17
142.00
October 21
24.00
October 30
119.26
December 8
220.00
December 11
222.43
December 20
75.00
December 23
32.00
Total
$2,148.45
1942
January 6
$ 188.09
January 20
134.75
January 22
115.05
January 27
50.00
February 18
252.55
February 24
150.88
February 25
101.50
March 9
309.75
March 19
55.00
March 25
70.44
March 31
25.41
Total
$1,534.42
1943
April 2
$1.00
Total
$1.00
*16 Withdrawals are represented by debit entries. Debit entries were made against the foregoing account in years and amounts, as follows: 1938
$9,308.75
1939
677.25
1940
151.00
1941
2,159.31
1942
1,501.81 Respondent's determination does not reflect any transactions with respect to the above account prior to the year 1941. The item in respondent's determination entitled "Cash used for business purposes and not deposited" is intended to represent expenditures in the operation of the amusement machine business which were paid in currency rather than by check. Each of the several expense items included in such amounts was included in the disbursements books. In determining whether or not each of such items was paid in currency or by check, cancelled checks were sought in the monthly bank statements representing payment for the specific entry in the books of account. If no check corresponding to a particular entry in the disbursements book was found, such entry was determined as representing payment in currency. The item "Cash used for business purposes and not deposited" as thus determined for the years 1939 and 1940 reflects approximately 25 expenditures for which *17 supporting checks or debit memoranda were later found, which expenditures aggregate $506.77 for 1939 and $551.62 for 1940. During the years 1941-1943, inclusive, United States government bonds in the name of petitioner, or decedent, or both, were purchased in the following amounts: 1941
$ 75.00
1942
1,593.75
1943
9,250.00
The amount of $800 included in respondent's determination "Payments on notes" in currency during 1943 represents payments on notes executed by decedent. Petitioner frequently endorsed notes executed by various operators with whom he did business and on occasions when the maker of the note defaulted, the amount defaulted was debited to the Goldbergs' bank account. Some of the checks deposited in the account of Novelty Amuse-U Company during 1941, 1942 and 1943 were returned because of insufficient funds in the accounts of their respective drawers, and the amounts thereof were debited back to the account of the Novelty Amuse-U Company. The amounts thus charged back to such account in those years were as follows: Year
Amount
1941
$ 25.00
1942
99.00
1943
205.08
During the year 1941, the Goldbergs received $4,000 from *18 the sale of equipment which had been purchased in or about April, 1941, from the Packard Manufacturing Company at an approximate cost of $3,300. On September 24, 1940, decedent sold and conveyed by warranty deed a parcel of real estate to a Mrs. A. J. Wilder for a consideration of $500. On the same date, the latter executed a security deed to decedent of the same property, as security for a debt owed by her to decedent in the amount of $720. This latter deed was cancelled of record as of September 28, 1943. In September, 1943, decedent sold real estate known as the Rockingham and Ridgeway Farms for a gross sale price of $23,000. In the same month, the property was deeded back to her to secure two debts aggregating $14,000. Decedent reported a short term capital gain in the amount of $9,528.82 in her return for 1943. In his 1943 return, petitioner reported the sale of real estate at a gross sales price of $2,600 and on which he sustained an ordinary loss of $1,441.67. During the year 1940, the Goldbergs borrowed $2,000 from Rebecca Levine; during 1941, they borrowed a sum of money from Carl Pfau; during the same year $5,000 was borrowed from Shelby Myrick, as agent, and a security *19 deed given therefor on certain property owned by decedent; and during the year 1942, decedent borrowed $1,250 from Henry Tennenbaum, which loan was secured by certain real estate owned by her. A computation of cost of goods sold was contained in each of the returns filed by petitioner and decedent for each of the years in question. Such computation was as follows: 1939
1940
1941
1942
1943
Opening Inventory
$34,760.00
$29,215.00
$30,235.00
$45,190.00
$45,547.50
Purchases
16,864.11
18,621.37
24,173.34
15,596.72
9,205.32
Material and Supplies
6,894.83
6,190.67
10,828.63
11,851.39
11,375.60
Closing Inventory
29,215.00
30,235.00
45,190.00
45,547.50
47,270.00
Net Cost of Goods Sold
29,303.94
23,792.04
20,046.97
27,690.61
18,858.42 The respondent in his determination has not disturbed the foregoing computation. The item "Purchases" entering therein was the amount reflected on the books of account as purchases of various types of amusement machines and automotive equipment, which were used in petitioner's business during such year. These purchases were entered on the books of account as of the date purchased when the purchase *20 was on terms requiring payment on delivery, and in instances of installment purchases, such items were entered on the books as of the dates of payment. The amount shown on the return as inventory at the beginning of each year and as inventory at the end of each year was taken from the "inventory" ledger sheet. Petitioner, in fact, had no inventory of merchandise held for sale at the beginning or at the end of any of the years 1939-1943, inclusive. Petitioner was not a dealer in amusement machines or automotive equipment, and with the exception of five sales of equipment purchased by him from the Packard Manufacturing Company (hereinafter called Packard) and which sales are more fully discussed below, petitioner sold no amusement machines or equipment for use in connection therewith during any of the years involved, and no such machines or equipment were purchased for the purpose of resale during those years. No automotive equipment was purchased by petitioner during any of such years for the purpose of resale, and, with the exception of two automobiles and one truck which were sold in 1943 after having been used in his business, petitioner did not sell any automotive equipment during *21 any of the years in controversy. The amusement machines and automotive equipment purchased and used by petitioner in his business had an average useful life of three years. About December, 1940, petitioner was appointed distributor for a portion of the State of Georgia for Packard. Packard manufactured equipment which permitted the utilization of mechanically good coinoperated phonograph equipment which had been made obsolete by changes in model and exterior design. As distributor of such equipment, petitioner made five separate sales thereof between April and the end of June, 1941. These sales totaled $4,000 and a gross profit was realized thereon in the approximate aggregate amount of $653.58. In addition to the equipment thus sold, petitioner also purchased Packard equipment for use in his own business. Purchases of Packard equipment by petitioner for the purpose of resale were made entirely within the year 1941, and all sales of such equipment were effected within that year. Petitioner had no inventory of this equipment purchased and held for sale to customers at the beginning or at the close of 1941. The above sales of Packard equipment were reflected in the income tax return *22 of petitioner and decedent for 1941 by a credit against or reduction of "Purchases" for such year in the foregoing computation in the amount of $4,000. Both petitioner and decedent owned various parcels of real estate which they rented to others during the years involved. In their income tax returns for the years 1939-1942, inclusive, and in petitioner's individual return for 1943, depreciation on rental properties was claimed, as follows: 1939
$1,000.00
1940
1,009.48
1941
1,056.86
1942
1,106.86
1943
275.33 On her individual return for 1943, decedent claimed a deduction for depreciation on rental properties in the amount of $869.86. Respondent has allowed in full the deductions so claimed, and has made no change in the computation thereof. In the returns filed by the Goldbergs for the year 1939, other business deductions were claimed, as follows: Salaries
$8,549.15
Interest
346.37
Taxes
4,764.90
Bad Debts
2,496.94
Auto Repairs
2,729.18
Gas, Oil, Travel Expense, Ex-
press, Machine Repair, etc.
7,175.32 Respondent has disallowed a portion of the deductions so claimed as follows Taxes
$ 650.00
Bad Debts
1,105.10
Traveling and other expenses
2,456.58
*23 Only the disallowance of the following amounts is contested herein: Taxes
$ 230.00
Traveling, etc. expense
2,196.60 Petitioner and decedent also claimed for the year 1939 deductions from rental income in the amount of $7,265.80, $200 of which has been disallowed by respondent, and a deduction for loss from fire in the amount of $2,500, $1,000 of which has been disallowed by respondent. Respondent's action in neither instance is disputed. Respondent also determined that petitioner and decedent received unreported income in 1939 on a real estate transaction in the amount of $341.95. During that year, decedent received a sum of money representing proceeds from the sale of real estate by her father, William Margone, in the year 1926. In their return for the year 1940, petitioner and decedent claimed other business deductions, as follows: Salaries
$9,539.25
Interest
1,050.30
Taxes
4,088.23
Auto Repairs
769.23
Insurance
492.33
Gas and Oil
1,590.21
Tires and Parts
536.69
Miscellaneous Expense
1,797.14
Travel Expense (Road men)
5,974.15
Legal Expense
1,239.80
Tel. & Tel.
555.46
Lights
196.62
Advertising
122.70 The respondent has *24 disallowed a portion of the deductions so claimed, as follows: Taxes
$ 420.00
Traveling, Legal and Other
Expenses
5,008.27 Of the amounts so disallowed, only the following are here contested: Taxes
$ 420.00
Traveling, Legal and Other
Expenses
3,272.44
In their return for the year 1941, petitioner and decedent claimed other business deductions in the following amounts: Salaries
$12,071.65
Interest
453.97
Taxes
3,915.60
Auto Repairs
747.33
Insurance
482.60
Gas and Oil
$2,880.84
Travel Expense (Road men)
5,807.14
Legal Expense
1,093.10
Tel., Lights and Heat
1,179.44
Adv. and Office Supplies
335.32 The respondent has disallowed a portion of the deductions so claimed as follows: Taxes
$ 809.37
Traveling, Legal and Other
Expenses
2,756.90 A portion of the foregoing disallowances is not contested. Those here contested are as follows: Taxes
$ 727.00
Traveling, Legal and Other
Expenses
2,150.90
In their return for the year 1942, petitioner and decedent claimed business deductions, as follows: Salaries
$11,079.50
Interest
596.44
Taxes
4,168.99
Auto Repairs
1,002.01
Insurance
432.55
Gas and Oil
1,674.19
Travel Expense (Road men)
4,739.41
Legal Expense
1,391.05
Tel., Lights and Heat
791.39
Adv. and Office Supplies
236.26
*25 The respondent has disallowed the following portion of the deductions so claimed: Taxes
$ 164.17
Traveling, Legal and Other
Expenses
3,365.58 Of the foregoing, only the following portions are here contested: Taxes
$ 164.17
Traveling, Legal and Other
Expenses
1,809.62 Petitioner and decedent also claimed a deduction for such year for State income tax paid in the amount of $522.42. Respondent's disallowance of $363.18 thereof as improper is not disputed. In the return filed by petitioner for the year 1943, the following general and operating expenses were claimed: Salaries
$12,751.83
Interest
142.39
Taxes
4,347.39
Auto Repairs
2,220.46
Insurance
50.00
Gas and Oil
402.03
Road Expense and Freight
5,808.17
Legal Expense
1,630.90
Tel., Lights and Heat
683.22
Adv. and Office Supplies
565.86 Of the foregoing, respondent has disallowed the following: Taxes
$ 297.00
Traveling, Legal and Other
Expenses
4,267.57 Such disallowances are in contest only as to the following amounts: Taxes
$ 220.00
Traveling, Legal and Other
Expenses
3,108.00
Petitioner also claimed in his 1943 return *26 a deduction for loss from the sale of noncapital assets in the amount of $1,441.67, of which $534.03 was disallowed as excessive; and deductions from rental income in the aggregate amount of $1,056.59, of which $92.62 was disallowed. Respondent's action in neither instance is in dispute. From the proceeds of a loan made to decedent by Shelby Myrick, the latter, on November 21, 1941, paid ad valorem taxes on behalf of decedent on real estate owned by her in the amount of $1,470.69. No deduction therefor was claimed on the 1941 income tax return filed by petitioner and decedent. In each of the years 1940-1942, inclusive, petitioner and decedent received income which they failed to report from sources and in amounts, as follows: Year
Estate
Amount
1940
Income from Estate of Joseph
Goldberg
$ 62.93
1941
Income from Estate of Joseph
Goldberg
136.12
1942
Income from Estate of Joseph
Goldberg
137.37
1942
Gain from sale of timber
1,500.00 On his individual tax return for the year 1943, petitioner failed to report income received from the estate of his father, Joseph Goldberg, in the amount of $140.75. Petitioner also failed to report therein income *27 derived from the sale of auto equipment which sold for $500, and on which there was a gain of $109.67. The income tax returns of petitioner and decedent for the years in question were prepared by A. L. Karp, who simply recorded whatever information was submitted to him by decedent. He never audited the Goldbergs' records nor verified the information thus submitted. Prior to and during the taxable years in question, petitioner operated a number of slot machines in various locations. In 1937, he was charged with operating slot machines in Emanuel County, Georgia, to which charge he pleaded guilty and was fined on September 17, 1937. On February 27, 1940, petitioner was found operating slot machines in several locations in such county. He pleaded guilty to two formal and distinct charges and on March 12, 1940, the City Court of Swainsboro, Georgia, fined him $350 and sentenced him to serve 12 months in jail subject to parole on condition that he wholly abstain during the life of the sentence from violating any penal laws of the State of Georgia. Petitioner also, at one time, received a judgment against him for operating slot machines in Claxton County. During the war years here in *28 question, petitioner had his slot machines in areas near large Army camps, Marine bases and shipyards which were filled with personnel. Such machines were very popular, and some of them averaged from $100 up to $162 per week per machine. Petitioner did not cooperate with Federal excise tax agents in that he consistently refused to furnish information or records as to the number and location of all his slot machines and other coin-operated devices. On February 20, 1923, petitioner was criminally indicted for failure and refusal to make income tax returns. To such charge, petitioner pleaded guilty, and on March 27, 1924, he was sentenced by the Federal District Court for the Southern District of Georgia to pay a fine of $2,000 and to remain imprisoned until the fine was paid or until otherwise discharged by law. Petitioner was subsequently paroled and as of November 3, 1953, such fine had not been paid and there was then outstanding against petitioner an execution issued out of the District Court for the collection thereof. On February 23, 1929, the same Court handed down a decree wherein the United States was given a judgment of $50,000 for civil income tax liabilities against petitioner *29 for prior years. This decree was based upon petitioner's offer to compromise such liabilities. In 1923, petitioner was criminally indicted on five different occasions for violation of the National Prohibition Act. One indictment included 40 counts. Petitioner pleaded guilty to four of the indictments and was found guilty on all five. He was sentenced to pay certain fines and to serve two years in the Federal penitentiary at Atlanta. Four of the fines totaling $8,000 had not as of November 23, 1953, been paid and were still outstanding against petitioner. During the years 1916 to 1937, inclusive, petitioner was charged on several occasions with violation of the criminal laws of the City of Savannah, Georgia, on many of which he was found guilty and given sentences. Some part of the deficiency in each of the years 1939 through 1943 was due to fraud with intent to evade tax. Opinion VAN FOSSAN, Judge: The first question for consideration is whether respondent properly determined the correct taxable net income of petitioner and decedent for the years 1939 through 1942 and of petitioner for the year 1943. In arriving at his determination, respondent, acting under the broad authority *30 of section 41 of the Internal Revenue Code of 1939, [1] has employed the so-called cash expenditures method of computing income. Petitioner protests respondent's use thereof and contends that such method does not more clearly reflect income than does the method regularly employed, and that, had the necessary effort been made, an accurate computation of income could have been made from the books and records maintained by petitioner and decedent. The cash expenditures method utilized by respondent is not a "method of accounting" within the scope and meaning of section 41, supra. Rather, when correctly applied, it is only evidence of income. Cf. Estate of *31 W. D. Bartlett, 22 T.C. - (September 21, 1954). Nor is the use thereof forbidden merely because a taxpayer presents books from which an income can be computed. The cash expenditures method, when properly applied, provides cogent evidence as to the reliability of such books. Thus, where the application thereof results in a wide variance with the income as computed from such books, the trustworthiness of the books is placed in serious doubt. Cf. Morris Lipsitz, 21 T.C. 917. Such is the situation here. Moreover, the scattered, haphazard, and fragmentary books and records maintained by the instant taxpayers were wholly inadequate. We, therefore, disagree with the contention that respondent's use of the cash expenditures method was unjustified. There was ample justification for respondent's action. The correctness of certain computations and adjustments made by respondent in his application of the cash expenditures method is the next question. Although the amounts of bank deposits for the years involved have been stipulated, the record clearly shows and respondent, on brief concedes, that the amount of bank deposits appearing in his computation set out above have been *32 understated for the year 1939 by the sum of $750. It is also clear from the evidence that there were additional bank deposits in the year 1942 in the amount of $1,066.31. At the hearing, respondent conceded that the amount of $720 included by him as "Payments on mortgages" for the year 1939 was an error since the transaction took place in 1940. As to respondent's computation of "Cash used for business purposes and not deposited" for each of the years involved, petitioner maintains and has presented testimony of a Certified Public Accountant to the effect that approximately 162 items were included therein for which such accountant later found supporting checks and debit memoranda. However, from the evidence appearing on this record, we have been unable to find that such items exceeded 25 in the aggregate in 1939 and 1940. Based upon such evidence, we have found as a fact that respondent's determination of "Cash used for business purposes and not deposited" for the years 1939 and 1940 reflects cash expenditures for which supporting checks and debit memoranda were later found in the aggregate amounts of $506.77 and $551.62, respectively. Respondent's determination, therefore, will *33 be adjusted accordingly. Petitioner also questions respondent's inclusion of $800 as "Payments on notes" for the year 1943. It appears that this amount was paid on notes executed by decedent. What other evidence there is on the matter preponderates in support of respondent's action with regard thereto. With respect to respondent's determination of "Purchases of Government Bonds" for the year 1943, petitioner seeks to cast doubt upon the accuracy thereof by arguing that no effort was made to distinguish between those purchased by petitioner and those purchased by decedent. However, the evidence directly bearing on this point fails to show what amount of the bonds in controversy, if any, was in fact purchased by decedent, and with funds originating with herself. As for petitioner's suggestion that such bonds are always purchased at 75 per cent of their face value, the stipulation shows only that bonds were purchased in 1943 in the amount of $9,250. It is not clear whether such amount was face amount or the purchase price thereof, and there is no other evidence with regard thereto. Such being the state of the record, we have no alternative to sustaining respondent's determination *34 on this point. Petitioner attacks respondent's determination of "Payments on real estate" for the year 1943 with the argument that no distinction was made between the amount of real estate purchased by petitioner and that purchased by decedent. In this respect, petitioner has elicited evidence tending to show that decedent sold some real estate for which she received approximately $9,000 in 1943. Thus, reasons petitioner, some portion of the amount of real estate purchases determined by respondent for 1943, may very well have been made by decedent with part or all of the funds so received by her in such year. However, in the absence of any direct evidence that decedent did in fact purchase any real estate in 1943, we may not set aside respondent's determination with respect thereto. As for respondent's determination of "Personal expenses paid for by cash", the record plainly shows that the amount of $3,000, included in each of the years involved, was a reasonable estimate of the amounts that need be expended for the every day essentials of living, such as food, clothing, maintaining a home, etc. Petitioner has presented no evidence to the contrary; therefore, respondent's determination *35 as to this item is approved. With regard to the item "Collections from machines" contained in respondent's determination of unreported receipts under the heading "Accounted For Funds Received From All Sources", the parties have stipulated that the correct total for the year 1939 discloses $200 more collections, and for 1943, $1,000 less collections. Respondent's determination will be adjusted accordingly. In his original determination, respondent determined as "Collections from rental property" for the year 1943, the amount of $5,630.72. He now concedes, however, that the proper amount so collected for 1943 should not be in excess of $2,046.40, and he has introduced evidence in support of such contention. Petitioner has presented neither evidence nor argument to the contrary. Accordingly, respondent's computation of "Accounted For Funds Received From All Sources" will be adjusted to reflect "Collections from rental property" for the year 1939 in the amount of $2,046.40. Petitioner maintains that respondent's determination of "Proceeds of loans from banks" for the years 1939, 1941, and 1942 should be adjusted to allow credit for additional loans of $49, $1,114.35 and $300, respectively. *36 The short answer is that petitioner's claims are not supported by any probative evidence. Therefore, respondent's computation of "Proceeds of loans from banks" for each of the years involved is approved. With reference to the item "Reimbursements to petitioners on endorsed notes for which petitioners had been charged and on other loans previously made", petitioner would have us adjust respondent's computation thereof so as to reflect an increase in each of the years 1939 through 1942 by the sum of $417.23, $341.09, $180.36 and $142, respectively. In support of such claim, petitioner has introduced into evidence debit entry memoranda showing that such amounts were in fact charged to his bank account, and the testimony of an accountant to the effect that the repayment thereof is not reflected in respondent's computations. Petitioner has, however, presented no evidence which would show that the amounts in controversy ever were actually repaid him. Without such evidence, petitioner's claim must be denied. The foregoing reasoning is equally applicable to petitioner's further claim for increases in the amounts determined by respondent to represent "Reimbursement on bad checks" for the *37 years 1941 to 1943, inclusive. That is to say, while there is sufficient evidence in the record to enable us to make a finding of fact with regard to the aggregate of checks charged back to petitioner's bank account in each such years, there is no probative evidence of any nature which would show what, if any, part thereof was in fact ever repaid petitioner. In any event, there is no evidence that such amounts have not been reflected in respondent's computation. Consequently, petitioner's claim on this point must also be denied. The next item of controversy involves respondent's determination of "Proceeds of sales of real estate". In this connection, petitioner complains that respondent erred in failing to include therein any amount as having been received by decedent in 1939 from James Alston representing the proceeds of a sale of real estate to the latter by William Margone, decedent's father. A subsequent issue infra involves respondent's determination that the amount of $341.95 constituted additional unreported income for 1939 derived from a real estate transaction. The inconsistency is obvious and stands unexplained in the record. Respondent's computation of accounted for funds *38 will, accordingly, be adjusted to reflect the receipt of such amount in 1939. Respondent's determination of "Proceeds from sale of real estate" in 1943 was in the amount of $11,600. Respondent now, however, maintains that the figure should be $2,600. It is respondent's position that the $9,000 thus eliminated represents proceeds received by decedent in 1943 from the sale by her of the real estate known as Rockingham and Ridgeway Farms. The evidence shows that decedent consummated a sale of the real estate in question in September, 1943, for $23,000, of which approximately $14,000 was represented by two trust deeds to secure debt aggregating such amount. Moreover, petitioner reported in his 1943 return the receipt of only $2,600 from the sale of real estate. On the basis of such evidence, we resolve this question in respondent's favor and hold that respondent's computation will be adjusted accordingly. Petitioner asserts that respondent's failure to include the sales of Packard equipment in 1941 in the amount of $4,000 "Accounted For Funds Received From All Sources" for such year was further error in his computation of income. On this point, the evidence shows, and we have found *39 as a fact, that Packard equipment was sold by petitioner and decedent in 1941 in the amount of $4,000 from which sales approximately $653.58 profit was realized. Moreover, it is also clear that such sales are not included within respondent's determination. Therefore, such determination will be adjusted so as properly to reflect $653.58 profit realized in Accounted For Funds for 1941. With regard to the aforementioned $720, the inclusion of which in "Payments on mortgages" for 1939 has been conceded as error by respondent, the record shows that such amount was paid to decedent between September 24, 1940 and September 28, 1943. Further, it is also clear that $220 thereof represented money loaned out by decedent in 1940. Accordingly, respondent's computation will be adjusted so as to reflect the lending of $220 in 1940 and the receipt of $60 in 1940 and $240 in 1941 and 1942, respectively. It also appears that petitioner and/or decedent borrowed $2,000 from Rebecca Levine in 1940; $5,000 from Shelby Myrick in 1941; and $1,250 from Henry Tennenbaum in 1942. It further appears that these amounts are not reflected in respondent's determination for accounted for funds in the respective *40 years. Hence, respondent's computation will be adjusted accordingly. As for petitioner's further claims with respect to the repayment during the years involved of money previously loaned out, it is sufficient to say that, in our opinion, such claims are not borne out by the evidence herein. Finally, we have thoroughly considered further contentions of the parties bearing upon the correctness of respondent's computation of income by the cash expenditures method and have found them to lack merit. Therefore, subject to the concessions and adjustments hereinabove specifically made, such computation is approved. The second issue is whether the respondent erred in using inventory and "cost of goods sold" in computing the taxable net income of petitioner and decedent for each of the years 1939 to 1942, inclusive, and of petitioner for the year 1943, rather than allowing deductions for depreciation on the various equipment used by them in the amusement machines business. There is no real dispute that such equipment was used in petitioner's business and was of the type subject to depreciation allowances. Nor is there any dispute that the "inventorycost of goods sold" method was not the proper *41 method to be used by petitioner and decedent, cash basis taxpayers. Such method has been consistently used by petitioner and decedent prior to and during each of the years here involved. Consequently, respondent, in his determination of deficiencies, left such computations undisturbed on the theory that the taxpayers had already effectively received full or excessive allowance for depreciation on all the equipment owned by them during the years 1939 to 1943, inclusive. No specific plan of accounting for depreciation is prescribed by statute. As provided in section 23(1) of the Code of 1939, [2] it is sufficient that the amount set aside each year for depreciation be according to a reasonably consistent plan whereby the amounts thus set aside, plus the salvage value, will, at the end of the useful economic life of a particular item of depreciable property equal the cost basis thereof. See also Regs. 103, section 19.23(1)-1. In this connection, respondent argues that the cost of goods sold method of accounting used by petitioner and decedent during the years in question was a reasonably consistent plan similar in many respects to the "Retirement Accounting Method", through the use of *42 which the cost of all equipment acquired by petitioner and decedent prior to 1939, as well as of that owned by them during 1939 through 1943, has been fully deducted on their tax returns. Whether petitioner and decedent have recovered the amount of their investment in the equipment involved is purely a question of fact. Petitioners have put in evidence a computation showing the depreciation to which they argue they are entitled. Such depreciation on property acquired in the years 1937 and 1938, as shown in the calculation, amounts in the aggregate to $34,740.35 for the years 1939 to 1941, inclusive. It is to be noted that this amount is substantially equal to the figure used for opening inventory on the 1939 income tax returns of petitioner and decedent, which amount, a simple mathematical computation will show, was never recovered. Respondent, however, points to the returns *43 of petitioner and decedent for the year 1945 wherein there was no closing inventory, and subsequent to which, it appears, the straight line depreciation method has been employed. This being true, he maintains that the petitioners have, therefore, received the full allowance for depreciation to which they are entitled. We notice, however, that the opening inventory on such 1945 return was also zero, while the closing inventory on the 1944 return was $50,583.50. Thus, it is obvious that the so-called cost of goods sold method utilized by petitioner and decedent, and which respondent would leave undisturbed, has not resulted in giving to the taxpayers the full allowances for depreciation to which they are entitled. However, as pointed out by respondent, in the calculations submitted by petitioners no provision is made for any salvage value such property might have. Nor, in view of the evidence indicating the subsequent sale of a portion thereof, can we agree with petitioner that there was no salvage value. Therefore, doing the best we can with the evidence on this record, we have concluded a reasonable estimate of such salvage value to average 10 per cent of the original cost of the property *44 involved. Cohan v. Commissioner, 39 Fed. (2d) 540. Subject to such adjustment for salvage value, the computation of depreciation submitted by petitioner is approved and will be reflected in the Rule 50 computation consequent hereon. The next question involves petitioner's claim that respondent erred in not allowing additional allowances for depreciation on rental property in excess of those claimed and allowed. Petitioner points out that in the 1939 return depreciation in the amount of $1,000 was claimed, based on rental property valued at $50,00 and using a 2 per cent rate. Petitioner also calls attention to the fact that in each of the years thereafter through 1942, depreciation was based on the same estimated amount, except that some additions and improvements to the property during such subsequent years were added to the basis on which depreciation was computed. Respondent maintains that, under the circumstances, petitioner and decedent are not entitled to allowances greater than those claimed and allowed. The "circumstances" to which he adverts are the difficulty he encountered in trying to ascertain the actual cost bases of the properties involved, and the inconvenience *45 to which he would be put in readjusting the tax returns of petitioner and decedent for subsequent years, which readjusting would be necessitated by any readjustment of rental depreciation for the years in question. Thus, he would leave undisturbed the rental depreciation allowances which apparently are admittedly wrong. Petitioner has submitted a corrected depreciation schedule for the rental property owned by him and decedent during the years 1939 to 1942, inclusive, and by him during the year 1943. This schedule, it appears, was prepared by a Certified Public Accountant on the basis of a prior schedule prepared by petitioner's son-in-law, which prior schedule showed the cost of properties, separated as to land and buildings; the accrued depreciation thereon of prior years; and the average useful life thereof. No showing has been made that the son-in-law was competent to apprise property, estimate the useful life thereof, or to prepare such a schedule. This being true, the accuracy of any computation based thereupon can be given very little weight. Nevertheless, rather than approve error which is apparently admitted, we are of the opinion that the Goldbergs should be allowed additional *46 rental depreciation for the years 1939 to 1942, inclusive, in the amounts of $160, $190, $250, and $240, respectively, and that petitioner should be allowed additional depreciation for 1943 in the sum of $60. Cohan v. Commissioner, supra.Accordingly, we so hold. The next issue involves the propriety of respondent's disallowance of certain deductions claimed as ordinary and necessary business expenses for each of the years 1939-1943, inclusive. Of these so disallowed, only a portion in each year is here contested by petitioner. Those deductions that were allowed in each year by respondent, those that were disallowed, and the portion thereof that are now in dispute are set forth in our findings. Included in the amounts so disallowed are deductions claimed by the taxpayers as representing travel expenses appearing on the books of account under the heading of petty cash. These amounts are as follows: 1939
$1,740
1940
2,620
1941
1,580
1942
2,170
1943
2,650
To support his contention that the foregoing amounts did, in fact, represent the traveling expenses incurred by his repairmen, petitioner relies upon the testimony of his son-in-law to the *47 effect that such expenses were entered under and generally taken out of petty cash, and the testimony of his accountant that such petty cash entries represented part of the road expenses of repairmen claimed on the returns. It appears that the testimony of the latter, who was retained some years subsequent to respondent's investigation, is based entirely upon what he was advised by petitioner and decedent as to what the various book entries represented. Such testimony, as well as the general testimony of the son-in-law, does not present the quantum of proof needed to establish petitioner's claims. Too well known to require citation of authority is the proposition that any deductions are matters of legislative grace, and to avail themselves thereof taxpayers must show that they are entitled thereto. All of which is to say, it is incumbent upon petitioner not only to show that such petty cash entries represented the expenses claimed, but also that such expenses were actual and proper. M. Rea Gano, 19 B.T.A. 518, 531. Moreover, in his computation of income by the cash expenditure method, respondent has included those amounts in question as accounted for funds. The effect *48 of such application was to reduce the amount of unreported income thus determined. Therefore, to approve petitioner's claim here would be to allow a double deduction. On this item, respondent's determination will not be disturbed. With respect to the other items of expense in dispute, petitioner relies heavily upon a schedule submitted in evidence entitled "Analysis of Traveling, Legal and Miscellaneous Expenses" and the testimony of the accountant who prepared it. However, the evidence is that such schedule, as well as the testimony, was based upon advice given by petitioner and decedent as to what the various items represented. As we have indicated above, such evidence falls short of sustaining petitioner's burden. There has been no proof made showing the disputed expenses to have been actual and proper. M. Rea Gano, supra.For aught the record shows, some, if not all, of the legal expenses involved might very well have been, and probably were, incurred in defending criminal actions against petitioner or his employees or securing their release from custody, or in regaining possession of slot machines which had been confiscated. In this connection, we take judicial *49 notice of the fact that the operation of slot machines within the State of Georgia was illegal and that such machines were subject to confiscation. Legal expenses so incurred do not constitute proper deductions. C. W. Thomas, 16 T.C. 1417; Harry Wiedetz, 2 T.C. 1262, modified by memorandum opinion of this Court dated January 31, 1944; Estate of John W. Thompson, 21 B.T.A. 568. Nor are sums expended as so-called protection money properly deductible. Charles A. Clark, 19 T.C. 48; G. A. Comeaux, 10 T.C. 201. Moreover, no deduction is allowable for personal gifts, section 24(a)(1), Internal Revenue Code of 1939, or, as contrary to public policy, for gifts made in the promotion of an illegal business. When considered as a whole, the evidence herein does not warrant any modification of respondent's determination on this point. Therefore, respondent's disallowance of the amounts in controversy claimed as travel, legal, etc. expenses is sustained. In controversy also is a portion of the amounts disallowed by by respondent, which amounts were claimed as taxes. Such amounts are set out in our findings. The same schedule which *50 was prepared by petitioner's accountant, based upon the advice of petitioner and decedent, is relied upon in most instances as proof of the impropriety of respondent's action. For reasons pointed out above, the schedule fails to perform this function. However, petitioner has shown that the amount of $420, disallowed as taxes in 1940, in fact appeared on the books of account under the heading of "Miscellaneous Expense" and was so claimed on the tax return. Petitioner offers no proof as to the merits of his claim. Although what difference it makes whether an item is disallowed under one heading or the other escapes us, respondent's determination will be properly so readjusted. Petitioner has introduced no further evidence nor plausible argument with respect to the other amounts disallowed by respondent as taxes claimed. Therefore, respondent's disallowance thereof is approved. Petitioner seeks a further and additional deduction of taxes in the amount of $1,470.69 for the year 1941, which amount was not claimed on the return filed for such year. Petitioner's proof shows that the amount in question was, in fact, paid to the Tax Collector, Chatham County, Georgia, on November 21, 1941, by *51 Shelby Myrick on behalf of decedent; that such amount was paid in satisfaction of state and county ad valorem taxes assessed for the years 1933, 1934, 1935, 1938, 1939 and 1940 upon certain property owned by decedent; and that decedent was the owner of the property during such years. The evidence also discloses that at least $9 of the amount so paid represented fees which are not properly deductible. Cf. New York v. Jersawit, 263 U.S. 493; Helvering v. Free Wines and Liquors, 134 Fed. (2d) 373; Helen B. Achelis et al., Executors, 28 B.T.A. 244. Petitioner's claim for an additional deduction for taxes in 1941 will, therefore, be allowed in the amount of $1,461.69. The next question is whether the amount of $341.95 constitutes additional unreported income for 1939 derived from a real estate transaction, as determined by respondent. Petitioner admits that such amount was not reported but maintains that it was a gift to decedent and, therefore, properly so excluded. In support of the position thus taken by him, petitioner has introduced evidence showing that on March 6, 1926, William Margone, decedent's father, conveyed certain real estate to James *52 Alston in consideration of $2,850, $300 of which was to be paid simultaneously with the execution of the contract, the balance, with interest, to be paid in 191 monthly payments of $25 each, and a final payment of $19; and that subsequently, on May 1, 1929, all right, title and interest of Margone in and to such agreement was transferred by gift to decedent. Included within the rights so transferred was the one to receive all future purchase payments due under the contract. Thus decedent was given the entire proceeds of the sale which remained unpaid, and, in our opinion, such proceeds as were subsequently collected by her do not constitute taxable income to her. Section 22 (b)(3), Internal Revenue Code of 1939. Respondent points out, however, that any payments made to decedent in 1939 which were in excess of the value of the rights received by her in 1929 would constitute taxable income. See Hatch v. Commissioner, 190 Fed. (2d) 254. But, for both estate and gift tax purposes the value of such rights will "* * * be presumed to be the amount of unpaid principal plus accrued interest to the date of the gift * * *" unless proven otherwise. See also Regs. 108, section 86.19(e); *53 Regs. 105, section 81.10(e). This being true, no portion of the amount received by decedent in 1939 by reason of the 1929 gift could be in excess of the 1929 valuation thereof. Respondent is reversed on this issue. Next is the question of fraud. Fraud is never to be presumed. The burden is on the respondent to demonstrate by clear and convincing evidence that some part of the deficiency in each year for which the socalled fraud penalty is asserted was caused by an intention on the part of the taxpayer involved fraudulently to evade the tax due. Moreover, involving as it does the personal intent of the taxpayers, and intent being a state of mind, seldom can one act be singled out and pointed to as evidencing such fraudulent intent. Rather, it is usually found by surveying the whole course of conduct of the taxpayer. Thus, whether a fraudulent intention is held by a taxpayer at a given time, is a fact to be gleaned, as any other fact, from all the evidence of record and inferences properly to be drawn therefrom. Charles E. Mitchell, 32 B.T.A. 1093, affd. sub nom. Helvering v. Mitchell, 303 U.S. 391. As was said by this Court in the Mitchell case: "In this *54 situation, the trier of the facts is charged with the responsibility of passing on the credibility of the evidence. This duty involves the winnowing of the wheat of truth from the chaff of untruth - the sorting of the real from the seeming. This duty is not without its inherent difficulty. In cases such as this, almost without exception, the taxpayer testifies categorically to the purity of his motives and the absence of fraudulent intent. And if, on the whole record, he convinces those charged with decision of his forthrightness of purpose, his innocence of improper motive, the impenetrable honesty of his position - if neither contradictory circumstance nor inherent lack of probability weakens his credibility, he must prevail. On the other hand, if, after listening to the taxpayer's protestations of innocence and hearing his explanations of his conduct, the trier of the facts is unable to give such protestations full weight and such explanation full credence, if on the whole record of fact, inference, and circumstance there abides in the mind of the trier a conviction, based on clear and convincing evidence, that fraud has been committed, then the decision must be against him. P. B. Fouke, 2 B.T.A. 219; *55 L. Schepp Co., 25 B.T.A. 419." In the instant proceeding the evidence shows decedent to have been well qualified as a bookkeeper. She had studied business administration at New York University and had graduated with a degree in accounting. The haphazard way in which the books of account of petitioner's business were maintained year after year and the inaccuracy and unreliability thereof lead us to the conclusion that such a condition of the records was not due to negligence alone but was the result of premeditated design. We have found large amounts of unreported income to have been received by the taxpayer in each of the years involved. Petitioner has admitted having failed to report some items of income in each year. Although failure to report income, standing alone, may be insufficient to establish fraud, James Nicholson, 32 B.T.A. 977; L. Glenn Switzer, 20 T.C. 759, the repeated and consistent practice throughout the years involved of understating income, whether in large amounts or small amounts, such as are likely to be overlooked by the taxing authority, such omissions being predicated upon "patently lame and untenable" excuses, or, as *56 here, no excuses at all in many instances, is strong and cogent evidence of an intention fraudulently to evade tax. M. Rea Gano, supra.Petitioner admits the impropriety of certain deductions in each year. It is "* * * but reasonable to look to the recurring presence of such improper deductions as corroborative of the intent of the [taxpayers] to evade taxes." M. Rea Gano, supra at 533; G. A. Comeaux, supra; Joseph H. Imeson, 14 T.C. 1151. After a thorough and painstaking study of the long record and the exhaustive briefs in this case, we are convinced, and, therefore, have found as a fact that some part of the deficiency in each of the years before us was due to fraud with intent to evade the tax. Accordingly, we here so hold. Having found fraud with respect to all the years here involved, the issue as to the applicability of section 6(a) of the Current Tax Payment Act of 1943 is resolved. That statute is by its own terms inapplicable in any case in which the addition to tax for fraud is found to apply to the taxable year 1942. See Max Cohen, 9 T.C. 1156, aff'd 176 Fed. (2d) 394. The next issue *57 is whether petitioner is liable for deficiencies in income and victory taxes and additions thereto for fraud in excess of those determined in the notices of deficiency, as claimed by respondent. This issue depends entirely on the proof and the mathematical results of the recomputations consequent hereon. If the recomputations result in larger deficiencies than those shown in the notices of deficiency, respondent has made due claim for such increased amounts, thereby satisfying the statute. The disposition of the next question whether petitioner and decedent are entitled to refunds claimed for the years 1940 and 1941, and petitioner to the refund claimed by him for the year 1943 being dependent upon our holding hereinabove with respect to the other issues, such question will be resolved in the Rule 50 computations consequent thereupon. Decisions will be entered under Rule 50. Footnotes
1. SEC. 41. GENERAL RULE. The net income shall be computed upon the basis of the taxpayer's annual accounting period (fiscal year or calendar year, as the case may be) in accordance with the method of accounting regularly employed in keeping the books of such taxpayer; but if no such method of accounting has been so employed, or if the method employed does not clearly reflect the income, the computation shall be made in accordance with such method as in the opinion of the Commissioner does clearly reflect the income. * * *↩
2. SEC. 23. DEDUCTIONS FROM GROSS INCOME. In computing net income there shall be allowed as deductions: * * *
(1) Depreciation. - A reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence) - (1) of property used in the trade or business, or * * *↩